602 A.2d 677

Lisa Joyce RUBIN

v.

STATE of Maryland.

No. 65, Sept. Term, 1991.

Court of Appeals of Maryland.

March 6, 1992.

Motion for Reconsideration Denied
April 8, 1992.

554

Alan M. Dershowitz, Joseph M. Lipner, Jack Zaremski, Rosanna Cavallaro; Claudia M. Marbach, Cambridge, Mass.; Barry Helfand, Rockville; Fred R. Joseph; and Alan Goldstein, Greenbelt, all on brief, for appellant.

Gary E. Bair, Asst. Atty. Gen. and J. Joseph Curran, Jr., Atty. Gen., both on brief, Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

RODOWSKY, Judge.

The principal issues in this murder case involve the evidentiary privilege for confidential communications between attorney and client. Those issues include determining how the privilege operates with respect to tangible evidence received, or simply observed, by counsel or counsel's agent.

Appellant, Lisa Joyce Rubin (Rubin), was found guilty by a jury in the Circuit Court for Montgomery County of the premeditated murder of her estranged husband, Timothy John Warner (Warner), and of the use of a handgun in a crime of violence. Rubin shot and killed Warner on April 24, 1990, in a wooded area in northern Montgomery County. The jury rejected Rubin's self-defense contention. The court sentenced Rubin to life imprisonment, suspended all but thirty years to be followed by five years probation, and made concurrent a twenty year sentence on the handgun charge. Rubin appealed to the Court of Special Appeals. We issued the writ of certiorari on our own motion prior to consideration of the matter by the intermediate appellate court.

Analysis of the attorney-client privilege issues requires a full statement of the facts. Rubin's appeal also complains of the rejection of a defense requested instruction and of the State's rebuttal argument. Additional facts concerning those latter contentions will be stated in Parts V and VI, *infra.*

Rubin and Warner met in the spring of 1979. She was then twenty-three years old and had graduated summa cum laude from college in 1975. He was a seventeen year old high school student. They married in May 1980. Rubin, who is apparently of independent means, supported the couple while Warner obtained a physics degree. At the time of his death Warner was employed at the Goddard Space Center of the National Aeronautics and Space Administration (NASA).

Rubin's self-defense theory evolves out of an affair which Rubin had carried on for some time with one William Glisson (Glisson), a Secret Service agent. Rubin told Warner of her affair with Glisson. Rubin testified that she began her affair with Glisson only after she learned, by reading Warner's diary sometime in 1985, that Warner had been having an affair. She said that Warner later destroyed the diary.

Rubin ended the relationship with Glisson after approximately one and one-half years. According to Rubin, Glisson was extremely jealous. One day Glisson came to the Warner–Rubin home, argued with Rubin, allegedly grabbed her forcefully by the wrists, and also choked her. Rubin claimed permanent nerve damage to her hand as a result of the assault, and she and Warner sued Glisson in the Circuit Court for Montgomery County for damages. In 1989, while the personal injury action was being tried, someone attempted to murder Glisson by placing cyanide in a bottle of cola in Glisson's refrigerator. The attempted murder was investigated by the Montgomery County Police Department, but no arrests were made.

Rubin testified that Warner hated Glisson for having hurt Rubin, and that in January 1990 Warner admitted to Rubin that Warner had attempted to poison Glisson. The admission, Rubin said, was precipitated by a visit to Warner by an FBI agent inquiring about the attempt on Glisson's life.

Warner moved out of the couple's home on March 11, 1990, leaving behind the Mercedes automobile that Rubin had purchased for him. On March 15, 1990, Rubin engaged Prudential Associates, Inc. (Prudential), a licensed private investigating agency, to prove that Warner was committing adultery. The president of Prudential is Robert Lawrence Miller (Miller), and one of Prudential's investigators was Robert Leopold (Leopold). Leopold was to become a witness for the State in the instant matter.

On March 17 Rubin placed a purchase order at a gun shop for a .38–caliber, Smith & Wesson "LadySmith," five shot revolver. At the same time she applied for the necessary permit from the Maryland State Police.

Warner had moved into the residence in Laurel, Maryland of Debra Ann Servin (Servin), a co-worker at NASA who had recently become separated from her husband. Servin described Rubin's visits to Servin's residence and to NASA, which together with Rubin's notes to Warner, formed the basis for the State's argument that Rubin's motive for murdering Warner was resentment at being scorned.

By April 16 Prudential had completed gathering evidence, including photographs, of the Warner–Servin relationship. The agency submitted its report to Jeffrey Greenblatt, Esq. (Greenblatt), the attorney whom Rubin had engaged to be her principal counsel in the domestic matter with Warner.

Rubin's initial contact at Prudential had been with Miller. During the course of the investigation, Miller developed a "personal relationship" with Rubin. They would have late night dinners together, she would confide in him concerning personal problems, and Miller assisted Rubin in finding a new residence.

Between the fifteenth and thirtieth of March, Rubin told Miller of an admission to her by Warner that he had attempted to poison Glisson. Miller was concerned that Rubin might be exposed to criminal prosecution for failing to report this information to the authorities. Miller advised Rubin to consult counsel, and he recommended Darrel L. Longest, Esq. (Longest) of Longest and Gavin. Longest maintained his office in the same group of townhouses in Rockville as did Prudential. Longest had represented Prudential, Miller and Leopold in various legal matters, Miller had recommended Longest as counsel to Miller's clients, and Longest exclusively used Prudential for investigations required in his law practice.

Rubin, pursuant to an appointment made on March 30, met with Longest on April 4. She paid him a fee of $5,000 which Longest said was not only for advice concerning the possible accessoryship problem, but also for advice concerning financial matters and for assistance to be rendered to Greenblatt in the forthcoming divorce case. Longest, who is a former Deputy State's Attorney for Montgomery County, spoke on behalf of Rubin to Matthew Campbell (Campbell), the then Deputy State's Attorney. By letter of April 10, received by Longest April 16, Campbell represented that the State would not prosecute Rubin if she "tells the truth and cooperates with the police in the investigation" of the attempted murder of Glisson.

At the motions hearing Longest testified that on one occasion prior to the shooting when Rubin was consulting with him, Rubin stated that Miller had related something to her which she had related previously in confidence to Longest. Rubin, Longest testified, expressed surprise that Longest would tell Miller. Longest explained to Rubin that Miller was "part of the team," that Rubin could "tell [Miller] anything and [Longest] can tell him anything, and it is not going to go anyplace." Miller testified at the motions hearing that, as a result of Miller's having referred Rubin to Longest, Prudential had not done, nor had it been asked

by Longest to do, any field work investigating the claim that Warner had attempted to kill Glisson.

On April 10, after her gun permit had been issued, Rubin took possession of the LadySmith revolver. At that time she also purchased and took possession of a .22–caliber, seven shot, semi-automatic, Beretta pistol and fifty rounds of ammunition for each handgun. Rubin testified that, because she was afraid of Warner, she intended to carry the smaller semi-automatic on her person when meeting with Warner, while keeping the larger revolver in the drawer of her bedside table.

Following up on the State's Attorney's letter to Longest, Detective Charles M. Shawen (Shawen) of the Montgomery County Police Department met with Longest and Rubin on April 20. Longest did most of the talking. Shawen's unarticulated reaction to the disclosures was skeptical, because of the impending divorce. The detective proposed that Rubin submit to a polygraph examination. Longest said that he and Rubin would discuss that suggestion, and the matter was left on that basis.

On Monday, April 23, Warner telephoned Rubin from work. They agreed that their old, large, allergy-plagued dog, Mutley, should be killed. They agreed to meet for that purpose the next evening at 6:00 p.m. at the Peachtree Veterinary Clinic in northern Montgomery County, where the couple was well known. In the conversation Warner also said that he wanted to discuss divorce when they met.

At 11:30 p.m. on the twenty-third, Rubin met Miller at a diner in Rockville for supper. Miller's memorandum of that meeting, which Rubin introduced at the suppression hearing, reflects that Rubin was saying that Warner still wanted to kill Glisson, that Warner had buried in his mother's yard evidence, indicated to be keys, linking him to Glisson's attempted murder, and that Warner was preparing to leave the area because he had submitted his resignation to NASA and had removed $50,000 from the couple's safety deposit

box. Miller's memorandum comments that "the story keeps getting more and more complicated."

Rubin and Warner met at the Peachtree Clinic about 6:00 p.m. on April 24, after Warner had left Servin to wait for him at a shopping center. From all of the evidence, including particularly a trail of the victim's blood leading up to the body, two clusters of five, spent, .38–caliber cartridges next to the body, and the nature of the wounds, the jury could find the following. Rubin arrived in her Alfa Romeo sports coupe more than one hour in advance of the scheduled meeting time, for the purpose of reconnoitering the area. She carried a large nylon handbag which contained, in addition to ordinary personal items, the loaded revolver and ten extra rounds of .38–caliber ammunition, the loaded Beretta and, in a clear plastic baggie, seven additional rounds of .22–caliber ammunition, a tape recorder and two tapes. Warner, with Mutley, arrived in a Mustang borrowed from members of his family. Warner and Rubin walked down a path through the woods behind the clinic. Warner, who was right-handed, had Mutley on a leash that was wrapped around Warner's right wrist. The couple proceeded about 1,000 yards down the woodland path. Rubin, using the .38, began shooting at Warner, face on. Three shots struck him in the chest or arms or both, and one shot missed. Bleeding, he was able to move back down the trail for about 200 feet. At some point, aiming the .38 downward and at close range, Rubin shot Warner in the front of the skull.[1] Warner fell, lying face down on the

---

1. The autopsy report's description of this wound reads:

"Situated on the right frontal scalp, 1″ below the top of the head and 1¼″ to right of the midline was a gunshot wound of entrance. The wound defect measured 7/16″ in greatest dimension and to include an abrasion margin with extension tear measuring up to 5/8″ oriented antero-inferiorly. There was no soot on the skin around the entrance wound. There was gunpowder stippling with a spread up to 2″ oriented anteriorly. The hemorrhagic wound track extended through the soft tissues of the scalp, perforated the right frontal bone which exhibited inner bevelling, perforated the right frontal

ground. Rubin ejected the five spent cartridges and reloaded. She fired five more rounds into Warner's upper left back as he lay prone. She ejected the five spent cartridges, reloaded the .38, and placed it back in the nylon handbag. She placed the Beretta under Warner's body. Although the Beretta's clip was full, there was no bullet in the firing chamber. In the course of these activities, whatever their sequence, Rubin dropped and left on the ground one of the .22-caliber bullets that had been in the baggie. She left Warner's body in the woods with Mutley still attached by the leash to Warner's right wrist.

Rubin's version of the events is that she had hoped to record at the meeting Warner's admissions of attempted murder. In preparation for meeting Warner, she looked for the Beretta but did not see it. She instead took the .38 and, in order to feel more secure, some extra ammunition. In the woods Warner, whom Rubin suggests must have stolen the Beretta from Rubin's bedroom, produced the Beretta and was about to kill Rubin after Rubin told Warner that Rubin had told the Montgomery County police of Warner's admission of the attempted murder of Glisson. When Warner threatened to kill her with the Beretta, Rubin pulled the .38 from her purse and, in panic, kept firing.[2]

Rubin, visibly shaken, returned to the veterinary clinic where she used the telephone. She told the clinic staff that she was able to reach Warner, who would be delayed. In

---

lobe, right temporal lobe, and penetrated, fractured and terminated in the right middle fossa of the base of the skull."

2. Rubin explained the reloading of the weapon in these words:
"A. He fell down and I had been firing while he had been coming towards me and then I kept firing. I didn't have any more bullets because I kept firing and then nothing was happening. It was just clicking, so I reloaded the gun.
"He had fallen down and I looked at him and he was still moving. He was making sounds and I knew that he still had the gun with him and I thought that he was still going to try to shoot me.
"Q. What did you do?
"A. I fired my gun again and I just kept firing it and I was so scared. I have never been so scared before. I thought he was going to kill me."

actuality, she telephoned Miller at Prudential. Rubin arranged to meet Miller at a shopping center 9.6 miles from the clinic at Route 28 and Quince Orchard Road. In the telephone call Rubin did not tell Miller the purpose of the requested meeting. Miller, fearing that there was going to be a confrontation with Warner, thought it advisable to bring along a witness. Miller directed Leopold, who was in the office, to come with him. Miller also brought a camera. Neither Miller nor Leopold attempted to telephone Longest from the Prudential office. Miller and Leopold traveled in separate cars.

At the shopping center Miller spoke privately with Rubin for approximately twenty minutes. While there, Miller directed Leopold to search the Alfa Romeo for a gun. Leopold searched, but found none. Miller has a telephone in his car, but he did not attempt to telephone Longest from the shopping center. Rather, Rubin traveled with Miller in his car, followed by Leopold in his car, to the veterinary clinic.

Rubin led Miller and Leopold along the path through the woods to Warner's body, to which Mutley was still leashed. Leopold testified that Rubin, at the crime scene,

"kept mumbling over and over things to the effect of, 'he's really dead. I can't believe it. I shot him. I didn't mean to. I only wanted to hurt him. I shot him. He kept coming at me. He's really dead.' Over and over again."

Miller took photographs of the corpse and of the scene. Leopold put the dog in a fenced area behind the clinic.

Walking back down the path to the clinic Leopold told Miller that they should call the police, but Miller told Leopold that the first call should be to Longest.

Using his car telephone, Miller called Longest at Longest's home. Miller told Longest that Miller was with Rubin at a veterinarian's in upper Montgomery County, that Miller believed Warner was dead, and that Longest should come immediately. Longest made arrangements to meet his part-

ner, David Gavin, and the two arrived at the Peachtree clinic at about 9:00 p.m.

At the parking lot of the clinic Longest talked with Rubin and Gavin talked with Miller and Leopold. Then, according to Longest, they conversed in a group. The essence of the conversation was that they would discuss the matter only among themselves "because our relationship with our client was going to continue in the same fashion that it had."

Rubin apparently had ingested a substantial amount of tranquilizers or other medication. Longest directed Leopold and Miller to take Rubin to the hospital, have her admitted for a drug overdose, and not to talk to anyone about what they had seen or heard. Miller and Leopold took Rubin to Montgomery General Hospital where she was registered under the name of Sharon Peterson. Rubin was not admitted and was discharged at 3:00 a.m. She spent the remainder of the night at the home of Miller and his wife, who is also an investigator for Prudential.

Meanwhile, Longest had notified the police who began processing the crime scene, illuminated by flood lights. During that processing a beeper which Warner had on his person was activated by a telephone call from Servin who was trying to find out what had delayed Warner. The police answered the page and learned from Servin that Warner had planned to meet Rubin at the veterinary clinic. A police check of handgun records revealed that both the Beretta found under the body and a .38–caliber Smith & Wesson had recently been purchased by Rubin. The veterinarian placed Rubin at the clinic on the evening of the 24th. By early afternoon on the day following the murder the police, utilizing the information reviewed in this paragraph, obtained a warrant for Rubin's arrest. She surrendered herself on the evening of that day.

Also on the day following the murder Leopold, without Rubin's consent, contacted the police, was interviewed, and gave information which was incorporated into an application for a warrant that was issued to search the offices of

Longest and Gavin. This application was admitted in evidence at the hearing on Rubin's motion to suppress. The application recites Leopold's activities and observations of the preceding evening, with the following additional particulars.

At the veterinary clinic Gavin asked Miller and Leopold if there were any guns and Leopold told him, "No." Longest told the investigators " 'you are working as agents for Longest and Gavin,' " and not to tell anyone what had happened. Longest further instructed Miller and Leopold to take Rubin to the hospital, get her admitted, and to use an alias.[3] The application further recites:

> "While Rubin was being treated Leopold looked through her purse, a tan colored Lesport bag. In the purse he observed a baggie with about 5 or 6 bullets in it and a minicassette recorder with 2 cassette tapes. Miller ended up taking possession of Rubin's purse and put it in the trunk of his vehicle. At around midnight, Miller left the hospital to meet with Longest and Gavin. The three then returned to the hospital at about 12:50 a.m. At around 2:00 a.m. Longest instructed Leopold to leave the hospital, which he did, and went home."

The application also states that on April 25 Leopold spoke with an employee of Longest and Gavin, Debbie Bundy. Bundy was delivering to a developing service the film which Miller had taken of the crime scene the preceding night.

Additional information underlying the search warrant was obtained by the police on the evening of April 25 from an anonymous female caller. She restated much of what Leopold had told the police. This informant, it was later learned, was an employee of Prudential to whom Leopold had described the events of the night and early morning of April 24–25.

---

**3.** At the suppression hearing Longest testified that he first learned from Miller that the decision had been made at the hospital to register Rubin under a false name.

The search of the Longest and Gavin offices on April 26 produced a number of items. In a locked, or lockable, file cabinet in the basement was the nylon bag; separate from the bag, in a manila envelope, was the .38–caliber revolver, fully loaded; and, in another manila envelope, separate from the bag, was the plastic baggie containing six .22–caliber bullets.

## I

Rubin moved to suppress, on the ground, *inter alia*, of attorney-client privilege, all communications made by Rubin. As argued, the motion was directed principally to testimony by Leopold narrating communications by and between Rubin, Miller, Leopold, Longest, and Gavin, including particularly Rubin's admissions to Miller and Leopold when she brought them back to the crime scene. At the motions hearing, and in this Court, Rubin submits that her consultation with, and legal representation by, Longest embraced all aspects of the relationship between Warner and Rubin and that, when she telephoned Miller from the Peachtree clinic, she sought assistance from him as an agent for Longest. Indeed, at the suppression hearing Rubin testified that her reason for calling Miller immediately after shooting Warner was "[b]ecause [she] wanted to get in touch with Mr. Longest," and she was aware that Miller "was able to get a hold of Mr. Longest."

The circuit court accepted Rubin's analysis in part and, on credibility grounds, rejected it in part. The court held that the relationship of attorney and client between the Longest firm and Rubin did not arise with respect to the death by shooting of Warner until Longest and Gavin arrived on the scene at the Peachtree clinic.

In *Harrison v. State*, 276 Md. 122, 132, 345 A.2d 830, 836 (1975), we described the privilege in the following fashion:
" 'The result of the authorities is that to make the communications privileged, they must be made during the existence of the actual relation of attorney and client, or

during interviews and negotiations looking to the establishment of such a relationship between the parties, and must relate to professional advice and to the subject-matter about which such advice is sought. When such conditions exist, the law will not permit the counsel to divulge the communications without the consent of the client.' "

(Quoting *Lanasa v. State,* 109 Md. 602, 617, 71 A. 1058, 1064 (1909) (emphasis omitted)).

■ The circuit court correctly recognized that the attorney-client privilege could embrace communications between Rubin and the investigators from Prudential. In *State v. Pratt,* 284 Md. 516, 520, 398 A.2d 421, 423 (1979), we observed that

"given the complexities of modern existence, few if any lawyers could, as a practical matter, represent the interest of their clients without a variety of nonlegal assistance. Recognizing this limitation, it is now almost universally accepted in this country that the scope of the attorney-client privilege, at least in criminal causes, embraces those agents whose services are required by the attorney in order that he may properly prepare his client's case."

In its ruling the circuit court applied the legal requirements that the communication must be made during the existence of the actual relation of attorney and client, or during interviews directed thereto, and must relate to the subject-matter about which the professional advice is sought. *Harrison v. State,* 276 Md. at 132, 345 A.2d at 836. For example, *Bieber v. State,* 8 Md.App. 522, 261 A.2d 202, *cert. denied,* 258 Md. 725 (1970), involved testimony by an attorney called by the State in a prosecution for forging and uttering a deed of trust. The forged instrument had been seized from the attorney's possession under a search warrant. Over a privilege-based objection, the attorney testified that the defendant had asked the attorney to hold the instrument which had been mailed by the clerk of court, at the defendant's direction, to the attorney after recordation.

The attorney had previously handled four transactions for the defendant, as client, and the attorney maintained a file of documents relating to those matters. With respect to the "transaction" involving the allegedly forged deed of trust, however, the attorney had not rendered any professional services, but had deposited the instrument in the client's file. The Court of Special Appeals, speaking through Judge Orth, concluded "in the light of the evidence, that an attorney-client relationship did not exist between [the attorney] and appellant with respect to the deed of trust." 8 Md.App. at 547, 261 A.2d at 215.

■ In the matter before us, different inferences could be drawn, including those relating to the scope of the subject matter of Longest's representation of Rubin prior to the shooting, to the Longest–Prudential relationship, and to the purpose of Rubin's telephoning Miller. These conflicts were for the circuit court to resolve. *See United States v. Tedder*, 801 F.2d 1437 (4th Cir.1986), *cert. denied*, 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987) (where privilege issue presented complex issues of fact, record was consistent with trial judge's finding that defendant, an attorney, spoke to another attorney, in law firm where both were employed, as a friend and not as attorney, even though still other attorneys in same firm were advising defendant concerning potential criminal charges).

The circuit court flatly stated that it "does not believe Ms. Rubin's testimony that she called Bob Miller because she wanted to get Mr. Longest." This finding was based on the facts that Rubin had met Miller the previous evening seeking his advice, independently of Longest; that Rubin had a personal relationship with Miller that had nothing to do with Longest; that Rubin had called Miller directly without first attempting to telephone Longest; that Rubin did not ask Miller to have Longest come to the scene; and that Miller had not attempted to reach Longest from the Prudential office, after receiving Rubin's call, or from the shopping center, after meeting with Rubin. The court further found that there was no employer-employee rela-

tionship between Longest and Prudential, and that Miller and Leopold were not acting as agents of Longest and Gavin when the former responded to Rubin's call. Finally the court found that Rubin, when making statements to Miller and Leopold prior to the arrival of the attorneys, did not believe that they were then acting as agents for Longest and had no expectation that her statements would be protected by attorney-client privilege. Indeed, the court found, based on Rubin's emotional state at the time, that it was highly unlikely that she gave any consideration at all to questions of confidential communication.

Under all of the circumstances of this case the circuit court was warranted in concluding that the attorney-client relationship respecting the homicide did not arise until the attorneys arrived at the clinic.

## II

Rubin next contends that the circuit court erred in permitting Leopold to describe at trial, over objection, a visual observation made by him. Leopold testified that there came a time "during the evening" when he observed approximately six rounds of live .22–caliber ammunition in Rubin's handbag.

## A

The manner in which this issue arose requires discussion. In the phase of the pretrial hearing dealing with Rubin's motion to suppress her statements, the testimony was directed almost exclusively to the period up to the arrival of Longest and Gavin at the Peachtree clinic. Neither at that phase, nor at trial on the merits, was there any testimony describing the circumstances under which Leopold looked into Rubin's purse. Some of the circumstances were revealed at the phase of the pretrial hearing dealing with suppression of the evidence from the attorneys' offices, when the application for the search warrant was introduced as a State's exhibit. The purpose for which that evidence

was admitted was not limited. Indeed, defense counsel wanted the search warrant introduced "at least for the purposes of any kind of appellate review."

During the course of the State's case-in-chief at trial on the merits, the State sought, prior to placing Leopold on the stand, a clarification concerning the scope of the court's pretrial ruling on attorney-client privilege. The discussion of this issue was held in chambers and off the record. When proceedings on the record resumed the court ruled that evidence of Leopold's observation would be admitted, for reasons we more fully state below. Rubin was given a continuing objection to that testimony.

In ruling on the admissibility of Leopold's observation evidence, the circuit court could consider the hearsay in the application to search Longest's office. *Collins v. State,* 39 Md.App. 165, 384 A.2d 120 (1978); L. McLain, *Maryland Evidence* § 104.2, at 72 (1987). The search warrant application tells us that Leopold looked in Rubin's handbag while Rubin was being treated at the hospital.

Thus, Leopold's observation was made after Longest began representing Rubin with respect to the Warner homicide and after Longest had directed Miller and Leopold to accompany Rubin to the hospital. The record, however, is far from clear as to whether Leopold's observation resulted from a communication or intentionally communicative act on the part of Rubin.[4] Nevertheless, it is clear that Leo-

---

4. We use the terminology "intentionally communicative act" in the sense in which it is used in E. Cleary, *McCormick on Evidence* § 89, at 213 (3d ed. 1984), where the author states:

"The commonly imposed limitation of protection to communications passing between client and attorney, while logically derived from the policy rationale of the privilege, does raise certain problems of construction where the information acquired by the attorney does not come in the conventional form of oral or written assertions by the client. Initially it is fairly easy to conclude, as most authority holds, that observations by the lawyer which might be made by anyone, and which involve no communicative intent by the client, are not protected. Conversely, testimony relating intentionally communicative acts of the client, as where he rolls up his sleeve to reveal a hidden scar or opens the drawer of his desk to

pold's opportunity to observe the contents of the bag resulted solely from his relationship to Rubin as an investigator on the defense team.

## B

In overruling the objection to Leopold's observation testimony the circuit court applied a rule enunciated by Justice Tobriner for the Supreme Court of California in *People v. Meredith*, 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46 (1981). In that case the accused, while confined and awaiting trial for murder and robbery, told his then counsel that the victim's wallet could be found in a barrel behind the client's home. The attorney sent an investigator to that location who found the wallet and delivered it to the attorney who turned it over to the investigating police officer. At a preliminary hearing the investigator testified, over objections by new counsel for the accused, where the wallet had been found.

The California court held that the attorney-client privilege "extends to protect observations made as a consequence of protected communications." 175 Cal.Rptr. at 618, 631 P.2d at 52 (footnote omitted). But in *Meredith* the attorney's investigator had removed the wallet from the place where he found it, and that location, behind the home of the accused, was a significant fact. Discussing that aspect of the problem, the court said:

> "When defense counsel alters or removes physical evidence, he necessarily deprives the prosecution of the opportunity to observe that evidence in its original condition or location. [T]o bar admission of testimony concerning the original condition and location of the evidence in such a case permits the defense in effect to 'destroy' critical information; it is as if ... the wallet in this case bore a tag bearing the words 'located in the trash can by

display a revolver, would as clearly be precluded as would the recounting of statements conveying the same information." (Footnote omitted).

[the accused's] residence,' and the defense, by taking the wallet, destroyed this tag. To extend the attorney-client privilege to a case in which the defense removed evidence might encourage defense counsel to race the police to seize critical evidence."

*Id.* at 619, 631 P.2d at 53.

For those reasons the court held that

"whenever defense counsel removes or alters evidence, the [attorney-client] privilege does not bar revelation of the original location or condition of the evidence in question. We thus view the defense decision to remove evidence as a tactical choice. If defense counsel leaves the evidence where he discovers it, his observations derived from privileged communications are insulated from revelation. If, however, counsel chooses to remove evidence to examine or test it, the original location and condition of that evidence loses the protection of the privilege."

*Id.* at 620, 631 P.2d at 54 (footnote omitted).

Rubin argues that we should not adopt the *Meredith* rationale because it makes the defense attorney "an important prosecution witness as soon as he alters or removes evidence, perhaps in even a slight or inevitable way." Appellant's Brief at 19. Rubin also contends that if *Meredith* is accepted by this Court, it should not be applied here due to a lack of evidence that the Rubin defense team altered the evidence.

Decisions discussing testimony by counsel under the subject circumstances generally do so as an offshoot of discussing counsel's responsibility when discovering or receiving tangible evidence of crime. "The cases all begin with the premise that a lawyer may not actively participate in hiding [a fruit or instrumentality of crime], or take possession of it in such a way that its discovery becomes less likely." 1 G. Hazard & W. Hodes, *The Law of Lawyering* § 1.6:401, at 193 (2d ed. 1991) (Hazard).

██ Frequently cited for the foregoing proposition is *In re Ryder*, 263 F.Supp. 360 (E.D.Va.), *aff'd per curiam*, 381

F.2d 713 (4th Cir.1967). The case was a disciplinary proceeding against an attorney whose client, an accused robber, told the attorney of money in a safety deposit box. Using a power of attorney from the client, the lawyer entered the box, found money and a sawed-off shotgun, and moved those contents to another safety deposit box rented in the attorney's name. Then Chief Judge Hoffman and Judges Lewis and Butzner, in a per curiam memorandum at the district court level, rejected the argument that the attorney's conduct was the exercise of attorney-client privilege. 263 F.Supp. at 365. In taking "the initiative in transferring the incriminating possession of the stolen money and the shotgun [the attorney] went far beyond the receipt and retention of a confidential communication from his client." *Id.* In affirming, the Fourth Circuit panel of Judges Sobeloff, Boreman and Winter said:

> "It is an abuse of a lawyer's professional responsibility knowingly to take possession of and secrete the fruits and instrumentalities of a crime. [The attorney's] acts bear no reasonable relation to the privilege and duty to refuse to divulge a client's confidential communication. Ryder made himself an active participant in a criminal act, ostensibly wearing the mantle of the loyal advocate, but in reality serving as accessory after the fact."

381 F.2d at 714.

To the same effect *see People v. Superior Court (Fairbank)*, 192 Cal.App.3d 32, 237 Cal.Rptr. 158, 159 (1987) ("[D]efense counsel may not retain physical evidence pertaining to the crime charged."); *Commonwealth v. Stenhach*, 356 Pa.Super. 5, 16, 514 A.2d 114, 119 (1986), *appeal denied*, 517 Pa. 589, 534 A.2d 769 (1987) ("[T]he overwhelming majority of states ... hold that physical evidence of crime in the possession of a criminal defense attorney is not subject to a privilege but must be delivered to the prosecution."); *Hitch v. Pima County Superior Court*, 146 Ariz. 588, 594, 708 P.2d 72, 78 (1985) ("[I]f the attorney has reasonable grounds to believe that the evidence might be destroyed ... he may turn the physical evidence over to the

prosecution."); *Clutchette v. Rushen,* 770 F.2d 1469, 1472 (9th Cir.1985), *cert. denied,* 475 U.S. 1088, 106 S.Ct. 1474, 89 L.Ed.2d 729 (1986) ("California law requires that a defense attorney must, after a reasonable time, turn evidence taken from its original resting place over to the prosecution."); *People v. Nash,* 110 Mich.App. 428, 447, 313 N.W.2d 307, 314 (1981), *aff'd in relevant part,* 418 Mich. 196, 341 N.W.2d 439 (1983) ("[D]efendant's attorney had a duty to relinquish the evidence to the authorities and . . . he did not violate defendant's attorney-client privilege by doing so."); *People v. Meredith, supra; Morrell v. State,* 575 P.2d 1200, 1210 (Alaska 1978) ("[A] criminal defense attorney must turn over to the prosecution real evidence that the attorney obtains from his client" or from a non-client third party.); *Anderson v. State,* 297 So.2d 871, 875 (Fla.App.1974) (attorney acted properly where he turned over stolen goods delivered by his client to his office); *State v. Dillon,* 93 Idaho 698, 710, 471 P.2d 553, 565 (1970), *cert. denied,* 401 U.S. 942, 91 S.Ct. 947, 28 L.Ed.2d 223 (1971) ("An attorney may not act as a depository for criminal evidence, and he may not suppress such evidence." (Footnote omitted)); *People v. Lee,* 3 Cal.App.3d 514, 526, 83 Cal.Rptr. 715, 722 (1970) ("A defendant in a criminal case may not permanently sequester physical evidence such as a weapon or other article used in the perpetration of a crime by delivering it to his attorney."); *State ex rel. Sowers v. Olwell,* 64 Wash.2d 828, 834, 394 P.2d 681, 684–85 (1964) ("[T]he attorney, after a reasonable period, should, as an officer of the court, on his own motion turn [criminal evidence] over to the prosecution.").

*Accord Spencer v. State,* 76 Md.App. 71, 79 n. 2, 543 A.2d 851, 855 n. 2 (1988) (*dicta* ); L. McLain, *Maryland Evidence* § 503.7, at 491 (1987) ("[C]learly the attorney cannot obstruct justice by destroying or concealing the evidence or aiding the client in so doing." (Footnote omitted)); J. Murphy, Jr., *Maryland Evidence Handbook* § 905H, at 333 (1989) ("[T]he lawyer cannot interfere with the state's right

to recover tangible evidence at the location and in the condition it was observed by defense counsel.").

When, complying with the above-described obligation, defense counsel has furnished tangible evidence in counsel's possession to the prosecution, the question arises as to how the prosecution's possession of the evidence is to be explained at trial. If the location of the real evidence was revealed to defense counsel by a non-client third party, then the attorney-client privilege does not prohibit the State from proving, even through testimony from the attorney or the attorney's agent, where and how the evidence was located. *See Morrell v. [Alaska]*, 575 P.2d at 1210 ("[I]f the evidence is obtained from a non-client third party who is not acting for the client, then the privilege to refuse to testify concerning the manner in which the evidence was obtained is inapplicable."); *Hitch v. Pima County Superior Court*, 146 Ariz. at 595, 708 P.2d at 79; *People v. Lee*, 3 Cal.App.3d at 527, 83 Cal.Rptr. at 723.

On the other hand, when the client tells the attorney where the tangible evidence is located and the attorney removes and takes possession of the evidence, or where the client delivers the evidence to the attorney by an intentionally communicative act or accompanied by, or resulting from, a confidential communication, the attorney-client privilege is implicated. Although the physical item itself is not privileged, the accompanying communications ordinarily are privileged. Hazard states that "[g]enerally, the defendant is required to stipulate where evidence originated, in exchange for the exclusion of evidence as to how it came into police hands." Hazard at § 1.6:401, at 194 (citing *People v. Meredith* (footnote omitted)).

When the issue arises absent any stipulation, the reasoning in the reported decisions becomes exceedingly close. One of the earliest cases to urge non-disclosure by the prosecution of the defendant as the source of the evidence is *State v. Olwell*, 64 Wash.2d 828, 394 P.2d 681. That was an appeal from a judgment of contempt against the attor-

ney for refusal to comply with a subpoena duces tecum, returnable to a coroner's inquest and seeking all knives possessed by or under the control of the attorney and relating to the client. The appellate court inferred that the knife came into the attorney's possession as a result of a communication by the client, and not through the attorney's investigation with third parties. The court next interpreted the subpoena to seek, in addition to any knife, the testimony of the attorney about physical evidence received from the client. The contempt judgment was reversed because the subpoena was invalid.

*People v. Nash,* 110 Mich.App. 428, 313 N.W.2d 307, involved the prosecution of the attorney's client for the murder of her husband. The police executed a search warrant in the attorney's office where they seized the murder weapon, ammunition, and the victim's wallet. These items were introduced at trial. "There was no testimony regarding the source from which defense counsel had received the evidence, however, it was elicited at trial that the evidence was procured pursuant to a search of the defense attorney's office." 313 N.W.2d at 312. The court held that "permitting the prosecutor to show that defendant's attorney had such evidence in his possession invites the jury to infer that defendant gave the evidence to her attorney. The prosecutor should not be allowed to accomplish by inference what he is clearly prohibited from doing by direct proof." *Id.* at 314.

Much the same reasoning was employed in *Anderson v. State,* 297 So.2d 871. The client was charged with receiving a stolen dictaphone and calculator. He retained counsel and subsequently delivered the stolen items to counsel's receptionist. Counsel in turn delivered them to the police. The prosecution subpoenaed the attorney and the receptionist to testify at trial. They obtained certiorari review of the denial of their motion to quash. The appellate court held that requiring the attorney to testify that the client once had had the stolen property in his possession "would be to

do violence to the fundamental concept of the attorney-client privilege." *Id.* at 875.

In *Commonwealth v. Stenhach,* 356 Pa.Super. 5, 514 A.2d 114, the court stated the rule to be that "the prosecution is entitled to use the physical evidence [delivered to it by the defense counsel] as well as information pertaining to its condition, location and discovery but may not disclose to a fact-finder the source of the evidence." 514 A.2d at 123. *Stenhach* was a criminal prosecution of defense attorneys who were convicted of hindering prosecution and tampering with evidence in an underlying murder case. The evidence in the murder case was a rifle stock which broke away from the barrel when the client struck the victim with the rifle. The client had disposed of the stock, but later drew a map for defense counsel which enabled the defense investigator to find the stock and deliver it to counsel. Although counsel had been required by court order in the murder case to produce the stock, it was not introduced in evidence. In articulating the rule, the court used "location" to mean where the stock was found and used "the source of the evidence" to mean the communication from the client.

*People v. Meredith,* relied upon by the circuit court in the instant matter, is factually similar to *Stenhach* in that the client's communications to counsel led the defense investigator to the place where the client had discarded physical evidence, which the investigator then took to counsel. Under those circumstances *Meredith* held "that whenever defense counsel removes or alters evidence, the [attorney-client] privilege does not bar revelation of the original location or condition of the evidence in question," 175 Cal. Rptr. at 619, 631 P.2d at 54, even if that original location indicates the accused as the source. *Meredith* is an exception to the general rule that, where the client is the source of physical evidence delivered by defense counsel to the prosecution, that source will not be disclosed to the fact-finder. It is clear from the footnote that the *Meredith* court inserted immediately following the statement of the

exception that *Meredith* is not intended to overturn the general rule.

"In offering the evidence, the prosecution should present the information in a manner which avoids revealing the content of attorney-client communications or the original source of the information. In the present case, for example, the prosecutor simply asked Frick where he found the wallet; he did not identify Frick as a defense investigator or trace the discovery of the wallet to an attorney-client communication."

631 P.2d at 54 n. 8.

*People v. Superior Court (Fairbank)*, 192 Cal.App.3d 32, 237 Cal.Rptr. 158, a case which applied the *Meredith* holding, also dealt with a communication from the client that advised the attorney where weapons could be found. In *Clutchette v. Rushen*, 770 F.2d 1469, where the court upheld on habeas corpus review a California conviction affirmed on the basis of *Meredith*, the accused client had told his attorneys where certain incriminating receipts could be found, and the attorneys dispatched their investigator to retrieve them.

■ The cases in which the *Meredith* exception has been applied involved tangible evidence that was left at a fixed location from which it was later removed by the defense team based on a communication from the client. Here, the State seeks to equate Rubin's person, or the handbag carried by her, with the fixed locations involved in the *Meredith* type of case. If Rubin had walked into Longest's office, engaged him to represent her, reached in the pocket of her coat, withdrew the murder weapon and the baggie of .22–caliber bullets, and handed them to Longest, Longest, by receiving the delivery, could not be said to have altered the condition of the evidence. The alteration which the State contends took place in the instant matter was the removal of the baggie of .22–caliber bullets from the handbag, where Leopold had earlier observed it, and placing the baggie of bullets in an envelope in the file cabinet at

Longest's office. What the State here seeks to classify as a *Meredith* "alteration" is the separation of the link between the bullets and the handbag which Rubin carried at the time of the murder. That separation is not, however, an alteration of location. It is a separation of the link between the physical evidence in the possession of defense counsel and the client source of that evidence. We hold that the Leopold observation testimony violated the rule recognized by nearly all courts that have considered the question, namely, that when the State uses in its case physical evidence obtained from defense counsel who in turn obtained it from the client as a result of privileged communications, the State ordinarily should not identify the client as the source of that evidence.

When the State introduced the bullets and other physical items in evidence through the police officer who had executed the search warrant at Longest's office, the State did not identify the premises as the office of Longest, or identify Longest as counsel for Rubin at the time. Indeed, the State did not even identify the premises as a law office. But Leopold's observation was made while acting as an agent for Longest who was then representing Rubin concerning Warner's death. The effect of admitting the observation testimony is the same as if Longest testified, without Rubin's consent, that Rubin had delivered the bullets to him.

### C

■ Although Leopold's testimony describing his observation of the bullets in Rubin's purse should have been excluded as privileged, the error is harmless beyond a reasonable doubt under the test of *Dorsey v. State*, 276 Md. 638, 350 A.2d 665 (1976). That is because, under the unusual facts of this particular case, the evidence of guilt was overwhelming. The relevance of the Leopold observation evidence was that, if Rubin carried .22–caliber bullets on the night of the murder, it tended to make it more likely that she also carried the Beretta. But, if the Leopold

observation evidence had been excluded, the remaining evidence could not give rise to a reasonable doubt.

Under Rubin's self-defense explanation of the unchallenged physical and forensic-opinion evidence a reasonable doubt would have to have been generated by the following.

● Warner entered the former marital abode and stole the Beretta which had been purchased well after he moved out.

● On the evening of the murder Warner carried the Beretta on his person, unobserved by Rubin, although his outer garments were slacks and a shirt, tucked into his slacks.

● Warner carried the stolen Beretta to meet with the victim of the theft on an occasion when they were to discuss divorce and to take Mutley on his final visit to the veterinarian.

● Warner had attempted to murder Glisson.

● Warner had admitted to Rubin that he had attempted to murder Glisson.

● In the woods Rubin told Warner that Rubin had told the police that Warner had admitted to her his attempt to murder Glisson.

● Warner reacted with rage, but Rubin neglected to tape record the conversation with Warner.

● In his rage, Warner produced the Beretta for the imminent purpose of killing Rubin by shooting at her—with a large dog leashed to the wrist of his gun hand.

● Before Warner could even chamber a bullet, much less get off a round, Rubin, in a state of panic, reached into her nylon sports bag and, from among the tape recorder, extra ammunition, and other contents, produced the .38 revolver and got off five rounds, four of which struck Warner.

● In panic generated by fear for her life, Rubin, as well as the bleeding Warner and the attached Mutley, moved for 200 feet through the woods.

● During that journey Warner did not drop the Beretta.

● Warner dropped the Beretta when he reached the point where he ultimately fell, with the Beretta landing beneath him.

● In panic generated by fear for her life, Rubin stood over Warner's prone body, opened the revolver's cylinder, ejected the five spent cartridges, reached into her sports bag for the supply of extra .38 ammunition, and reloaded the revolver.

● In panic generated by fear for her life, Rubin fired five more bullets into the back of Warner as he lay, face down, on the ground.

● In panic generated by fear for her life, Rubin opened the revolver's cylinder, ejected the five spent cartridges from the second volley, reached into her sports bag for the balance of the supply of extra .38 ammunition, and reloaded the revolver for a third volley, which she then realized was unnecessary.

The requirement that an error be harmless beyond a reasonable doubt before it may be treated as non-prejudicial is not intended to afford an opportunity for jury nullification, particularly of the prohibition against premeditated murder. We are satisfied beyond a reasonable doubt that, absent the Leopold observation evidence, the jury's verdict nevertheless would have been the same—guilty of premeditated murder and of use of a handgun in a crime of violence.

### III

Rubin contends that there is a want of probable cause for the issuance of the warrant for the search of Longest's office because information which violated her attorney-client privilege must be excised from the application for the warrant. This leaves, Rubin argues, insufficient cause even if the attorney-client privilege pertinent to Leopold's disclosures did not arise until Rubin consulted Longest concerning Warner's death.

The argument principally concerns the LadySmith revolver, the .38 ammunition with which it was found loaded, and the .22 ammunition, identified by Leopold. The objects seized were introduced into evidence through the police officer who executed the search warrant.

Rubin's argument assumes that the privilege, founded in the Maryland law of evidence, would be enforced by a Maryland law based exclusionary rule that would prevent the State from introducing into evidence objects obtained under a search warrant, the legal sufficiency of which depended on information obtained from a person who violated the privilege in giving the information. The argument further assumes that the information would be excluded even if the police did nothing to encourage the violation of the privilege. We need not decide these questions.

█ Even if we accept Rubin's argument, it is clear that the physical items seized at the attorneys' offices under the search warrant would inevitably have been recovered by the police. A rule of Maryland law that suppressed the fruits of a search based on privileged information would not have prevented the ultimate receipt by the State and offering into evidence of the items held by the attorneys. As explained in Part II.B, *supra*, the attorneys had an ethical obligation under Maryland law, entirely independent of the search warrant, to deliver the physical items to the police at a time, which need not now be specified, in advance of trial. *See Commonwealth v. Stenhach*, 356 Pa.Super. at 23–24, 514 A.2d at 123 (denying attorney's contention that duty to deliver evidence to prosecution does not arise until court orders attorneys to do so).

█ Rubin also contends that, even if the application for the warrant to search Longest's office is left unexcised, it nevertheless lacks probable cause, so that the fruits of the search must be suppressed. This argument relies on the exclusionary rule that enforces the fourth amendment to the United States Constitution. As a matter of law, Rubin had no reasonable expectation of privacy in the items seized

from Longest's office, because of counsel's ethical duty to deliver the evidence to the police.

## IV

■■■ Maryland Code (1974, 1989 Repl.Vol.), § 9–109 of the Courts and Judicial Proceedings Article creates a privilege for communications between a patient and psychiatrist or psychologist. Under that section

> " '[p]atient' means a person who communicates or receives services regarding the diagnosis or treatment of his mental or emotional disorder from a psychiatrist, licensed psychologist, or any other person participating directly or vitally with either in rendering those services in consultation with or under direct supervision of a psychiatrist or psychologist."

§ 9–109(a)(3). A patient "has a privilege to refuse to disclose, and to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder." § 9–109(b). Rubin argues that this privilege was infringed. We do not agree.

At trial there was very little evidence concerning what occurred at Montgomery General Hospital. Leopold did not describe for the jury what transpired there. Rubin's testimony on direct stopped short of narrating the events during that part of the night in question. On cross-examination of Rubin the State sought, over objections, to elicit by leading questions that she told the hospital personnel that she had attempted suicide by taking an overdose of drugs. Rubin denied that those were the facts. Rubin then admitted having "since learned" that the name, "Sharon Peterson," had been given as her name to the hospital personnel, but Rubin said she did not know who gave that name. The defense neither objected to the questions eliciting these answers, nor moved to strike the answers. The State then attempted to inquire about blood tests, prompting another objection. A bench conference was held, the objection was sustained, a motion for mistrial was made and denied, and

the State moved on to another subject in its cross-examination.

Thus, there was no evidence at trial that Rubin personally communicated anything to anyone at the hospital. Rubin contends, however, that giving a false name is privileged under § 9–109. Assuming, *arguendo*, that § 9–109 is properly so construed, and assuming further that the false name was given by someone, with Rubin's authority, for the purpose of diagnosis or treatment, any error in the admission of the evidence concerning the false name was not preserved by objection.

The motion for mistrial went to the entire line of examination, and the court did not abuse its discretion in denying that motion.[5]

## V

■■■ Citing *Hunter v. State*, 82 Md.App. 679, 573 A.2d 85 (1990), Rubin next submits that the circuit court erred by failing to instruct the jury, as requested, that consulting an attorney is not evidence of consciousness of guilt. The request for an instruction was inspired by some of the prosecutor's comments at the conference on prayers, but the prosecutor never made those comments in argument to the jury.

At the conference on jury instructions, the court initially proposed to give a flight instruction. One of Rubin's attorneys pointed out that the instruction could not refer to Rubin's having consulted counsel. The court then considered additionally telling the jury that telephoning one's lawyer does not constitute flight. That proposal struck the prosecutor as unfair. He commented that Rubin did not call an ambulance, she called her lawyer. After further

---

5. In footnotes 7 and 9 to her brief as appellant, Rubin argues that the information concerning Montgomery General Hospital should have been excised from the search warrant application before determining probable cause. The inevitable recovery analysis applied in Part III of this opinion, *supra*, applies with equal force to this contention.

discussion the court concluded that it would not instruct on flight and that the parties could argue from the facts. The court also cautioned the prosecutor to stay away from an argument based on Rubin's consulting counsel, because that was "a delicate area."

The instructions actually given by the circuit court did not refer to flight, or to any particular act or omission as evidence of a consciousness of guilt. Defense counsel noted the following exception.

> "The other thing that we would ask for is that since it appears that the State is going to argue in this case that the defendant went up and called her detective/lawyer, they are going to argue, in effect, that the defendant should be inferred to be guilty from that fact.

> "Calling a lawyer is an essential right that a person has in this society and we would ask Your Honor to instruct the jury that the mere fact that a person called their lawyer, or a person working for their lawyer, is not evidence of the defendant's guilt and should not be considered as flight." [6]

The court would not supplement the instructions, commenting: "Well, I will let you argue your case and not me."

In accordance with the judge's admonition, and contrary to the expectations of defense counsel on which the exception was predicated, the prosecutor did not argue that consulting one's attorney is evidence of a consciousness of guilt.

In arguing to the jury the prosecutor referred twice to Rubin's attorneys on the night of the murder. We set forth the full context of those references in the note below.[7] In

---

6. The State in its brief as appellee argues that this requested instruction is not a correct statement of the law. We need not decide that issue, and we intimate no opinion on it.

7. In his closing argument the prosecutor said:
 "She runs up to the clinic and she has got to tell them something. She doesn't know what she told them. Well, she doesn't tell them, 'Call the police. Call an ambulance.' She says—and your memory

context, the argument is entirely appropriate and does not bear the connotation which Rubin seeks to place upon it.

 Consequently, there was no reversible error in denying the requested instruction. A court, when properly requested to do so, is obliged to instruct on the legal issues generated by the evidence. *Johnson v. State*, 303 Md. 487, 495 A.2d 1 (1985), *cert. denied*, 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). Here, the requested instruction seems to be an effort to have the court comment on, and perhaps neutralize, an anticipated argument by the State. But, even if the instruction were required when requested, the error is harmless beyond a reasonable doubt because

---

is better than mine—but, 'Tim needs more time. He is not ready. He needs another hour. Maybe we will be back.'

"If that is not a lie—because we know he is lying dead or dying on the path—and why is she doing—she is trying to explain his absence and create an opportunity for her to leave and she does. She doesn't go from there to the police. She calls a private investigator, a Mr. Miller, and meets with him and talks with him and this is a person who is a close personal friend. They go out to dinner.

"She ends up spending that night with him and she meets with him and brings him back to the scene and then after the lawyers get involved she goes to the hospital and checked in under a fake name, Sharon Peterson, and then spends the night at Mr. Miller's house.

"Only after the police get a warrant and they put the case together and she is notified of that warrant, then she turns herself in at the police station. Does she flee from this scene? You bet. Does she lie? You bet. Does she show consciousness of guilt? In other words, 'I am an innocent man. Let's go to the police. I will explain to you what happened.' Never. Never."

In his rebuttal the prosecutor's argument was consistent with the circuit court's analysis in partially denying the suppression motion. He said:

"So, you know, she has already been seen there [at the clinic]. It is her gun [*i.e.*, the Beretta]. She had no option but to stick it under there [Warner's corpse] and then run—she says for her lawyers—but run to her private investigator, a personal friend, and try to figure it out and lied to the people up there, lied to them as to what happened."

(We have modified the punctuation in the immediately preceding quotation from that appearing in the transcript prepared by the typist working from the audiotape used in the court reporting system in the Circuit Court for Montgomery County).

the prosecutor never made the argument to which the instruction would have been directed.

## VI

During the State's argument in rebuttal to the defense summation, the prosecutor stated, with no evidentiary basis whatsoever, that Rubin had attempted to poison Glisson. There was no objection by the defense. Rubin now argues that this clearly improper argument deprived her of her due process rights to a fair trial and to be advised of the charges against her, and that the deprivation should be recognized as plain error.

In the State's summation in chief the prosecutor argued that, in order to explain why Warner supposedly had a handgun when he was killed, Rubin lied about Warner's having admitted that he poisoned Glisson. In the course of that analysis the State suggested that, although the defense trial tactic was to leave the Glisson matter as a "cloud out there," the State had brought out in cross-examining Rubin the details which, the prosecutor submitted, should lead the jury to reject Rubin's testimony. During defense closing argument, counsel responded to the State's accusation that the defense did not want to talk about Glisson. Counsel asked the jury to recall that Glisson had first been injected into the case by defense cross-examination of Servin, but that the State had raised an objection which the court had sustained. The defense submitted that it had tried to bring to the jury all of the facts about Glisson.

In rebuttal the State acknowledged that it had objected because it did not "want to try the Glisson affair, as it is aptly named." But, the State argued that, inasmuch as it had been brought into the case, the Glisson affair shed light on how Rubin's mind worked. The prosecutor drew a parallel between the Glisson affair and the matter before the jury. He submitted that Rubin had been rejected in both instances, that she then resorted to law—as to Glisson, by suing him for damages and, as to Warner, by seeking to

have him arrested for attempted murder. In drawing the next step in the parallel, the prosecutor said that Rubin had poisoned Glisson and had murdered Warner.[8]

There was no basis in the evidence, or in any legitimate inference from the evidence, for the prosecutor's statement that Rubin tried to kill Glisson. The argument went well beyond the "oratorical conceit or flourish" which this Court permits. *Wilhelm v. State*, 272 Md. 404, 413, 326 A.2d 707, 714 (1974).

The issue was not preserved for appellate review by objection to the argument. "However, as [former] Rule 756 g makes clear with respect to jury instructions, and as the cases hold with respect to errors of law generally, an appellate court may in its discretion in an exceptional case take cognizance of plain error even though the matter was not raised in the trial court." *Dempsey v. State*, 277 Md.

---

**8.** The transcript of the subject portion of the argument reads as follows:

"It is really illuminating the way her mind works and how is that? She has an affair with a man [Glisson]. She testified on the stand, 'I love this man.' It breaks up very badly. There is at least the allegation of physical, you know, fight between the two of them and what is her first reaction? To go to Court to get the law involved.

"So, she goes to Court and she sues him alleging nerve damage to her hand. I mean, that is what she said. As I said, you can't prove that. You can't disprove it. It is up to the jury to decide, just like you all.

"Then, when that doesn't seem to be working out well, in the middle of the trial the very man with whom she seemed to break up with gets poisoned. So, when that doesn't work, she takes it in her own hand and tries to kill him and why? 'Because this man had the audacity to walk out on me,' William Glisson.

"Does that matter? No, except to the extent it lets you see how the mind works, because what happened here? Timothy Warner wanted out, too. Evidently he didn't learn from the first event and what is the first thing he does? She turns to the Court.

"She goes to the police and says, 'He [Warner] confessed to me ... recently about a crime that occurred a year and a half ago and I want you to lock him up,' and the police don't do anything about it. The Court system didn't work. Bringing the lawyer in to meet with the detective didn't work.

"So, what does she do then? She takes it in her own hand and this time she is much more direct. She takes this Smith & Wesson, a LadySmith revolver, and sets him up and kills him."

134, 141–42, 355 A.2d 455, 459 (1976). *See also State v. Daughton,* 321 Md. 206, 210–11, 582 A.2d 521, 523 (1990) ("[A]n appellate court may recognize *sua sponte* plain error, that is, error which vitally affects a defendant's right to a fair and impartial trial.").

*Trimble v. State,* 300 Md. 387, 478 A.2d 1143 (1984), reiterated the circumstances justifying the exercise of plain error discretion as follows:

"We said in *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035, 1038 (1980), that 'we have characterized instances when an appellate court should take cognizance of unobjected to error as compelling, extraordinary, exceptional or fundamental to assure the defendant of fair trial.' We further made clear that we would intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial."

300 Md. at 397, 478 at 1148. *See also Calhoun v. State,* 297 Md. 563, 594, 468 A.2d 45, 59 (1983); *Hall v. State,* 292 Md. 683, 690–91, 441 A.2d 708, 712 (1982).

We have not "set forth any fixed formula for determining when discretion should be exercised." *State v. Hutchinson,* 287 Md. at 202, 411 A.2d at 1038. But, "we do expect that the appellate court would review the materiality of the error in the context in which it arose, giving due regard to whether the error was purely technical, the product of conscious design or trial tactics or the result of bald inattention." *Id.* at 202–03, 411 A.2d at 1038. The enumerated factors "are ordinarily inconsistent with circumstances justifying an appellate court's intervention" under plain error. *Id.* at 203, 411 A.2d at 1038.

The unobjected-to, improper argument in the case before us does not rise to the level of the deprivation of a fair trial. This is a less stringent standard than the *Dorsey* standard of harmless beyond a reasonable doubt which we applied to the preserved objection discussed in Part II.C. *A fortiori,*

the improper argument is not a basis for reversal in view of the overwhelming proof of guilt. Further, given the fact that Rubin was represented by three highly qualified and experienced criminal defense counsel, we cannot say on this record that tactical reasons did not dictate a decision not to object to the argument.

JUDGMENT OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.

McAULIFFE, Judge, concurring.

I disagree with the Court's holding in Part II B that it was error to admit evidence of the presence of .22–caliber bullets in Rubin's purse shortly after the shooting. If we assume Leopold's observations of the contents of the Rubin's purse were subject to the protection of the attorney-client privilege, they are also subject to the concomitant ethical obligations of disclosure by virtue of the change in condition of the evidence.

After an excellent discussion of the perplexing problems created by an attorney's receipt of tangible evidence from a client, and after seemingly accepting the principles set forth in *People v. Meredith*, 29 Cal.3d 682, 175 Cal.Rptr. 612, 631 P.2d 46 (1989), the Court concludes that the attorney may with impunity destroy significant evidentiary value flowing from the relative location of those objects one to the other by altering their position before surrendering them. I disagree.

The principal significance of the .22–caliber bullets is that they were located in Rubin's purse when that purse was given by the client to the attorney or to the attorney's investigative agents. Assuming, as a majority of the cases seem to hold, that the privilege would have prevented Longest from telling the State he had gotten the purse from Rubin, the privilege would not have protected the disclosure of other relevant information. Longest would have been required to inform the State, at the time he surrendered the

tangible property, of the *condition* it was in when received, i.e., that the baggie containing six .22–caliber bullets was within the purse.

> [W]henever defense counsel removes or alters evidence, the statutory privilege does not bar revelation of the original location or *condition* of the evidence in question. We thus view the defense decision to remove evidence as a tactical choice. If defense counsel leaves the evidence where he discovers it, his observations derived from privileged communications are insulated from revelation. If, however, counsel chooses to remove evidence to examine or test it, the original location and *condition* of that evidence loses the protection of the privilege.

*People v. Meredith, supra,* 175 Cal.Rptr. at 620, 631 P.2d at 54 (footnote omitted; emphasis added).

Longest would also have been required to disclose the location where he or his agents took possession of the purse, and the date and time of that possession. The State would then have been permitted to place before the jury the tangible objects, together with information that on a particular date and at a particular time and location the purse was present and the bullets were within the purse.[1] The State would have been required to tie the purse to Rubin, but if this could have not been done by the contents of the purse, Leopold could have testified concerning non-privi-

---

1. Precisely how such information is presented to a jury is, of course, a problem calling for careful consideration by the trial judge. The "location," for example, might best be described as the area of Olney, rather than by the name of the hospital. The preferred solution for the presentation of such evidence is probably a stipulation, to the form of which the defendant's trial counsel could agree while still preserving an objection as to privilege. Alternatively, the trial judge might approve a statement of evidence which the prosecutor could read to the jury, perhaps accompanied by instructions from the court that the statement is to be received by the jury as evidence. I have not endeavored to exhaust the possible options—the goal is simply to place before the jury, in some form in which the jury understands the information to be evidence, the factual information that is not privileged.

leged observations he made of Rubin and the purse before Longest arrived on the scene.

There is a fine and delicate balance to be struck here between two very important principles: the attorney-client privilege on the one hand, and the high ethical obligation of an attorney on the other hand. Neither the client nor the attorney should be permitted to hide or alter evidence of criminal activity by the simple expedient of delivering it to the attorney. If the Court is correct in the instant case, however, an attorney may successfully destroy the evidentiary value of the .22–caliber bullets by separating them from the purse in which he received them. I think it entirely reasonable, in an attempt to fairly accommodate both principles, to permit the introduction of evidence that the attorney is required to promptly disclose to the State. For this purpose, we should consider to have been done that which should have been done.

CHASANOW, J., joins in this opinion.

ROBERT M. BELL, Judge, dissenting.

In part II. B., after a painstaking and flawless analysis, involving the review and discussion of numerous cases which have touched on the issue, the majority concludes, quite properly so, that the observation, by the private detective, of .22 caliber bullets in the petitioner's purse was made while a part of the defense team and, consequently, resulted from privileged communications. It holds, therefore, that the court erred when it permitted the private detective to testify concerning his observations. The majority goes on, in part II. C., this time, unfortunately, without the same painstaking and flawless analysis, to hold that the error was harmless beyond a reasonable doubt. I agree that the trial court erred. I do not agree that the error was harmless.

In finding the error to be harmless, the majority's analysis is that, excluding the erroneously admitted evidence, that which remains is so overwhelming that no rational jury

could have reached a different verdict. In support, it sets out 15 propositions, which it characterizes as " 'unchallenged' physical and forensic-opinion evidence," from which, it maintains, the petitioner would have been required to generate a reasonable doubt that she acted in self-defense. It concludes that a reasonable doubt could not have been generated from that evidence.

In addition to first degree murder, the court, at petitioner's request, instructed the jury on second degree murder. Consequently, in addition to the question of the effect of the error on the issue of the petitioner's guilt or innocence, there is the additional one of whether it influenced the jury determination of the extent of the petitioner's culpability, *i.e.* did it influence the first degree murder determination? I am satisfied that the error influenced both the issue of guilt and the issue of how culpable the petitioner was.

## I.

Following a thorough review of our cases and those of the Supreme Court which addressed the issue, this Court, in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976), enunciated the test of harmless error which controls the resolution of this case:

> ... When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict. (footnote omitted)

*Id.* at 659, 350 A.2d at 678. The test focuses on the effect of erroneously admitted, or excluded, evidence on the verdict rendered by the jury. Once it has been determined that error was committed, reversal is required unless the error

did not influence the verdict; the error is harmless only if it did not play any role in the jury's verdict. The reviewing court must exclude that possibility, "beyond a reasonable doubt."

We also made clear that the test of harmless error is supposed to be strict; indeed, it "has been and should be carefully circumscribed." *Younie v. State*, 272 Md. 233, 248, 322 A.2d 211, 219 (1974). In that case, quoting *People v. Jablonski*, 38 Mich.App. 33, 195 N.W.2d 777, 780 (1972), we pointed out:

> "Continued expansion of the harmless error rule will merely encourage prosecutors to get such testimony in, since they know that, they have a strong case, such testimony will not be considered to be reversible error, yet if they have a weak case, they will use such testimony to buttress the case to gain a conviction and then hope that the issue is not raised on appeal."

272 Md. at 248, 322 A.2d at 219.

Where the evidence remaining after excluding erroneously admitted evidence is insufficient to sustain the conviction, the error can never be harmless. Similarly, if the questioned evidence goes to an important issue in the case, especially if credibility is central to the resolution of the case, the error in admitting that evidence is likewise not harmless. This is the case because it is the trier of fact, in this case, the jury, not an appellate court, that must find the facts and resolve credibility issues. Therefore, what appears, on the cold record, to be an insurmountable case for the State, when viewed from the jury's perspective, having seen it unfold through live witnesses, in the dramatic atmosphere of the courtroom, may be quite a close case or result in a defense verdict. How, or why, a jury may decide to resolve credibility or fact issues in a particular manner is a matter only it knows. One thing is certain, the jury is under no obligation to decide any case consistently with what is, objectively, the strongest case.

Thus, although relevant, as a threshold matter, to the harmless error inquiry, we are not here concerned with

whether the evidence, exclusive of the detective's observations, is sufficient to sustain the jury's verdict. It undoubtedly is. Nor need we decide whether a rational jury, presented with evidence, appropriately shorn of the detective's testimony regarding the contents of the petitioner's purse, was required, as a matter of law, to find her guilty. It clearly was not. We are concerned, rather, with whether the jury that considered the evidence that was, in fact, admitted, was, or could have been, influenced, in rendering its verdict, by evidence that should not have been admitted.

The relevance of the private detective's testimony that he saw .22 caliber bullets in the petitioner's purse is its tendency to prove that, on the day of the victim's murder, the petitioner possessed the Beretta, the gun found under the victim's body. It could be inferred from that testimony that the petitioner brought the Beretta to the murder scene, having lured her husband there, and, after shooting and killing him, planted it under his body, thus, creating the predicate for the self-defense story she would later tell. With that testimony as the foundation, the jury could have concluded, as it undoubtedly did, that the petitioner's self-defense testimony was just so much bunk and, consequently, that she had carefully planned, and executed, the murder. When told of having seen, in the petitioner's purse, .22 caliber bullets fitting the Beretta, the petitioner's self-defense testimony notwithstanding, it is difficult to imagine how the jury could have reached any verdict other than "guilty of murder in the first degree." The fact that there were .22 caliber bullets in the petitioner's purse a short time after the petitioner claimed she shot the victim in self-defense had to play a role, if not a significant one, in the jury's deliberations; it *certainly* tended to negate the self-defense theory. Application of the *Dorsey* test leads inexorably, in my opinion, to the conclusion that admission of the complained of evidence was by no means harmless. To the contrary, it was exceedingly harmful; it could not help but be.

Upon its independent review of the record, the majority declares its belief, beyond a reasonable doubt, that absent the detective's observations, the jury's verdict would have been the same. Although it cites *Dorsey*, the majority does not apply the harmless error test as there enunciated. Instead, it applies the test as explained in *Ross v. State*, 276 Md. 664, 674, 350 A.2d 680, 686-7 (1976):

The essence of this test is the determination whether the cumulative effect of the properly admitted evidence so outweighs the prejudicial nature of the evidence erroneously admitted that there is no reasonable possibility that the decision of the finder of fact would have been different had the tainted evidence been excluded.

Thus, excising the evidence admitted in error, and focusing on what remains, it concludes that a reasonable doubt simply could not have been generated from that evidence. Under that formulation, the test for harmless error is: whether, excluding the offending evidence, that which remains is sufficient to sustain the conviction and/or is, in fact, such that the case for conviction is "overwhelming." It requires, in addition to the threshold determination of sufficiency, that an appellate court weigh the evidence. So, the majority reasons, where the evidence is sufficient to convict and it is also strong enough to meet its definition of "overwhelming", only one verdict, guilty, is possible, as a matter of law; hence, that evidence cannot generate a reasonable doubt.

Although the *Ross* formulation of the test has been stated in subsequent cases, *see Trusty v. State*, 308 Md. 658, 668-69, 521 A.2d 749, 754 (1987), and even applied, *see Mills v. State*, 310 Md. 33, 48-49, 527 A.2d 3, 10 (1987) (dicta), I have found no case which has provided a reasoned justification for it. It is significant, I think, that the error in *Ross* was held not to be harmless and that a factor influencing that holding was that the case was tried by a jury. 276 Md. at 674, 350 A.2d at 686-7. *See also State v. Fuller*, 308 Md. 547, 554, 520 A.2d 1315, 1318 (1987) (where trier of fact considered erroneously submitted evidence,

case remanded to determine if, without that evidence trier of fact would reach same conclusion). In any event, that approach, in my opinion, is contrary to the role of an appellate court.

No matter how strong a case for conviction the State may present, even when the defense presents no evidence, the court may not direct a verdict for the State. *See* Maryland Rule 4–324, which, while providing that a defendant may move for judgment of acquittal, Rule 4–324(a),[1] and the court may direct the entry of judgment in his or her favor if there is insufficient evidence, as a matter of law, Rule 4–324(b), makes no provision for the making of a motion for judgment by the State. Compare Maryland Rule 2–519,[2] the civil counterpart. *Lyles v. State*, 308 Md. 129, 135, 517 A.2d 761, 764 (1986). This is so because it is the trier of fact, whether the court or a jury, that must determine if the State has met its burden of proof. To make that determination, the *trier of fact* is required to find the facts and when, as is usually the case, there are credibility issues, to resolve them. That, in turn, involves weighing the evidence. Appellate courts do not find facts or weigh evidence, "what evidence to believe, what weight to be given it, and what

---

**1.** Maryland Rule 4–324(a) provides:

(a) *Generally.*—A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment of acquittal shall be necessary. A defendant does not waive the right to make the motion by introducing evidence during the presentation of the State's case.

**2.** Maryland Rule 2–519(a) provides:

(a) *Generally.*—A party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party, and in a jury trial at the close of all the evidence. The moving party shall state with particularity all reasons why the motion should be granted. No objection to the motion for judgment shall be necessary. A party does not waive the right to make the motion by introducing evidence during the presentation of an opposing party's case.

facts flow from that evidence are for the jury ... to determine." *Dykes v. State,* 319 Md. 206, 224, 571 A.2d 1251, 1260-1 (1990). *See Gore v. State,* 309 Md. 203, 214, 522 A.2d 1338, (1987); *Wilson v. State,* 261 Md. 551, 566, 276 A.2d 214, 221 (1971); *Jacobs v. State,* 238 Md. 648, 650, 210 A.2d 722, 723-4 (1965). Even when an appellate court assesses the sufficiency of the evidence, it does not weigh it, *see Clemson v. Butler Aviation–Friendship,* 266 Md. 666, 671, 296 A.2d 419, 422 (1972); *Gray v. Director,* 245 Md. 80, 84, 224 A.2d 879, 881 (1965), it only determines if any evidence exists, on the basis of which a rational trier of fact could find the elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560, 573 (1979); *Bloodsworth v. State,* 307 Md. 164, 167, 512 A.2d 1056, 1057 (1986). There is no reason that a harmless error analysis should permit it to do more.

By basing its harmless error determination, in part, on the inability of the petitioner to generate a reasonable doubt from the evidence available for its consideration, the majority necessarily has determined the weight to be given the evidence. When it weighs evidence, an appellate court usurps the function of the jury. Moreover, despite its characterization to the contrary, the majority is actually construing the *Dorsey* test as permitting harmless error to be determined on an "otherwise sufficient" basis: if the evidence is sufficient without the improper evidence, *i.e.,* the jury could have convicted the defendant without it, harm could not have resulted. In any event, whether intended or not, there is a real danger that it will be so construed in future cases. This is nothing more than unwarranted expansion of the harmless error rule, which should not be condoned.

## II.

Even if the test applied by the majority were the proper one, reversal is still required.

The petitioner testified that she purchased both a .38 caliber "LadySmith" revolver and the Beretta for protection from the victim, whom she feared. She registered both guns, intending to carry one, the Beretta, on her person whenever she met with her husband, and to keep the other at home in her bedside table. The petitioner purchased ammunition for both guns.

On the day of the murder, the petitioner testified that when her husband arrived with their dog, he wanted to take him for a walk. That is why they went into the woods. Subsequently, she told her husband that she had told the police of his admission to her that he had attempted to kill her former boyfriend. At that, she said, the victim became enraged screaming, "You are never going to get a chance to tell the F.B.I. anything else." He then pulled the Beretta from his pocket and pointed it at her. Moving more quickly, her hand being already in her open purse, poised to turn on the tape recorder, the petitioner maintained that she pulled the LadySmith revolver she had on her person and shot the victim. Concerning the reason she had the Lady-Smith revolver, rather than the Beretta, she asserted that she noticed the Beretta was missing as she was leaving to meet the victim and, so, she picked up the LadySmith. She assumed that the victim took it; he had a key to her home. She also testified that she continued to shoot him because the victim kept coming toward her. She explained that she shot him while he was lying, face down, on the ground because he was still moving and making sounds and she knew that he still had the Beretta.

The majority may well be correct, even without the evidence of the .22 caliber bullets in the petitioner's purse, the case against the petitioner is very strong, maybe even overwhelming, in favor of the State. It is not so overwhelming, however, as to require, as a matter of law, a verdict for the State; a trier of fact, in this case, the jury, is not compelled to find the petitioner guilty. That the petitioner's case suffers badly in comparison to the State's and may only be characterized as "weak" does not mean that

the petitioner automatically loses. When, as in this case, credibility is involved, a jury is never required to accept, as true, the allegations of the party, which, on an objective basis, presents the strongest case; it may choose to accept the position advocated by the opponent. It is the jury which, having seen and heard the witnesses and resolved conflicts in the testimony, must assess, *i.e.*, weigh, the evidence. To adopt the majority's position as noted earlier, is to, place the responsibility for weighing evidence on the appellate court.

The petitioner's testimony that the victim may have taken the Beretta from her home and brought it with him to the rendezvous is neither improbable nor impossible. That he did not do so may be more plausible, but that is not dispositive. Moreover, the fact that the victim wore only slacks and a shirt does not render the petitioner's testimony that he carried the gun on him inherently unbelievable. Critical to this issue is information bearing on how tapered the victim's slacks and shirt were, for it, along with evidence as to the size of the Beretta, will determine the plausibility of the petitioner's testimony on this point. The petitioner has apparently maintained for some time that the victim tried to murder her former boyfriend. From that proposition, it is but a small leap to the propositions which flow from it. Thus, neither the testimony that the victim admitted the attempted murder to her, nor the testimony that the victim flew into a rage when told she had discussed that fact with the police is unreasonable or wholly devoid of credibility. And it is reasonable, hence, by no means unbelievable, that one who is engaged in a rather tense encounter with an enraged person, who, incidentally, has also pulled a gun on her could forget to turn on a tape recorder. To be sure, the majority's point that a person does not usually go for a gun while holding a large dog with his gun hand is a strong one; however, just how strong is a matter best left for the jury, and not this Court, to decide. If that proposition were true, it would make more plausible one that now seems hopelessly implausible *i.e.*, having produced

the gun while holding a large dog renders it somewhat understandable that he did not operate it either very efficiently or quickly, which, in turn, may explain why the petitioner had the opportunity to retrieve, and fire, her own gun.[3] Whatever my, or the majority's conclusions, on the point, it is possible that the jury could have been convinced that panic is the explanation for why the petitioner reacted as she did once she shot the victim.

## III.

The jury found the petitioner guilty of premeditated first degree murder, as opposed to second degree non-premeditated murder. Even if the erroneously admitted evidence did not influence the jury's verdict on the issue of the petitioner's guilt or innocence, I believe that it must have influenced the jury's decision on the degree of her culpability.

> Murder is the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation. These qualifying malevolent states of mind are: 1) the intent to kill, 2) the intent to do grievous bodily harm, 3) the intent to an act under circumstances manifesting extreme indifference to the value of human life (depraved heart), or 4) the intent to commit a dangerous felony. (footnote and citation omitted)

*Ross v. State,* 308 Md. 337, 340, 519 A.2d 735, 736 (1987).

Maryland Code (1957, 1992 Repl.Vol.) Art. 27 § 407 defines murder in the first degree as "[a]ll murder which shall · be perpetrated ... by any kind of willful, deliberate and premeditated killing...." *See Wooten–Bey v. State,* 308 Md. 534, 537, 520 A.2d 1090, 1091 (1987); *Ross v. State,* 308 Md. at 337, 341, 519 A.2d 735, 737; *Newton v. State,* 280 Md. 260, 268, 373 A.2d 262, 266 (1977). All murder not

---

3. The majority's editorial comments as to what was in the petitioner's purse depend, I suspect, on the evidence that should have been · excluded and, hence, may not be considered.

designated as murder in the first degree is deemed to be murder in the second degree. Maryland Code, Art. 27 § 411. Thus, murder that is not premeditated, deliberate and wilful, or that is not committed in the perpetration of the felonies enumerated in §§ 408–410, is murder in the second degree. The burden is on the State to prove, beyond a reasonable doubt, the degree of the murder committed by a defendant. *Hook v. State,* 315 Md. 25, 28 n. 5, 553 A.2d 233, 235 n. 5 (1989), *Wilson v. State,* 261 Md. 551, 563, 276 A.2d 214, 221 (1971), *DeVaughn v. State,* 232 Md. 447, 456, 194 A.2d 109, 114 (1963), *cert. denied,* 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964), *Elliott v. State,* 215 Md. 152, 160, 137 A.2d 130, 134 (1957), and *Chisley v. State,* 202 Md. 87, 105, 95 A.2d 577, 585 (1953).

In the case *sub judice,* the critical issue was, did the petitioner act deliberately and with premeditation? The evidence supporting that intent was, of course, the private investigator's observations. Because it placed bullets for the Beretta in her purse, the jury was enabled to infer that the petitioner murdered the victim premeditatedly, and with deliberation. With that evidence out of the case, the jury could have accepted the petitioner's testimony on the critical issue and concluded that she did not plan the murder. Again, the critical inquiry is not whether the evidence is sufficient to support the verdict rendered or the weight that evidence should be given; all we need do here is to determine whether, if faced with two choices, there was a sufficient factual predicate to have enabled the jury to find either. On this issue, notwithstanding that they are not, objectively, equally plausible, I think that there was.

### IV.

In my opinion, the petitioner was prejudiced by the admission of the private detective's observation of the bullets in her purse. I would, accordingly, order the new trial to which she is entitled.