## ELLIOTT *v.* STATE

[No. 84, September Term, 1957.]

154

*Decided December 19, 1957.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, and HORNEY, JJ.

*Dallas F. Nicholas,* for appellant.

*Theodore C. Waters, Jr., Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City,* and *James F. Price, Executive Assistant State's Attorney,* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

John Wesley Elliott, (the defendant), was indicted by the Grand Jury of Baltimore City on November 8, 1956, for the murder of Lindsay Calhoun, (the deceased), on September 12, 1956. He entered a plea of not guilty. At a trial on March 13, 1957, by the Criminal Court of Baltimore

('Tucker and Cullen, JJ.), sitting without a jury, he was found guilty of murder in the first degree. A motion for a new trial was denied by the Supreme Bench of Baltimore City, and on May 6, 1957, the defendant was sentenced to "suffer death by the administration of a lethal gas". From the judgment and sentence the defendant appealed.

Maude Belle Beckworth *or* Calhoun, (the former common law wife of the defendant *or* Maude Belle), testified that she and the defendant had lived together for about six or seven years as man and wife. The relationship was not harmonious and, after several periodic separations, she left the defendant finally at Christmas in 1955. According to her the defendant stabbed her with a knife shortly after the final separation, and she was afraid of him. After her separation from the defendant the former common law wife began going with the deceased. A marriage license had been applied for, but the deceased died before it could be used. The license was picked up by Maude Belle on September 14, 1956, but she insisted that it was found by the undertaker on the body of the deceased. According to her, while she and the deceased were at the health clinic on September 10, 1956, the defendant's aunt told her that the defendant knew she was married and was outside and wanted to see her. When they were leaving the clinic the defendant told her that the marriage would not do her any good. On September 12, 1956, the day of the shooting, Maude Belle was cooking breakfast at her mother's house at 504 Ogston Street when she was summoned to the door and was told by a boy that a lady across the street wanted to see her. She did not go out, but returned to her chore. However, before the deceased had closed the door she had noticed the defendant's aunt peeping out of the door of her house across the street at 760 Bradley Street, and saw someone by the window but could not say who it was. Shortly after this incident, the deceased, who wanted cigarettes, got a dollar from Maude Belle and went out. About five minutes later she heard a noise that she thought was a car back-firing.

The twelve year old boy, who knew the defendant, acted as a messenger, and was dispatched by him at 7:30 A. M.

on the day of the shooting to tell the former common law wife that a lady wanted to see her. He delivered the message and returned to his home. About two minutes later he heard a noise which also sounded to him like the back-fire of a car. When asked to fix the time he delivered the message, he said he got up at 6:00 A. M. and had been playing in the street about an hour and a half when he was sent by the defendant to 504 Ogston Street, but in court he was unable to tell what time it was by the courtroom clock.

From the back door of her home at 1053 Myrtle Street, an eleven year old girl had observed a man, whom she did not know, with a long shot gun go through the yard gate, drop what turned out to be a red shot gun shell, and go out to George Street.

When the police arrived shortly after 7:33 A. M. they found the deceased lying on the south sidewalk of Bradley Street against a building about ten feet east of Ogston Street with a match box resting on the inner side of the deceased's right wrist and a cigarette in a pool of blood beside his right thumb. Apparently the deceased had been shot while he was in the act of lighting a cigarette. No weapon was found on the deceased. The shot gun was found in a vacant house on Shields Place.

The defendant was apprehended in North Carolina, was extradited and returned to Maryland. Upon his return he was interrogated by the police on November 11, 1956. The statement he made was introduced in evidence without objection.

According to his statement, the defendant got up about 6:30 A. M., went to a tavern for whiskey, and was returning to his aunt's house when he encountered the deceased at 504 Ogston Street. The deceased hit him with a chair rung as he passed by. A fight ensued. When it was over the deceased threatened to settle the affair by coming over and shooting it out. The defendant returned to 760 Bradley Street, stood in the door and watched Ogston Street. He saw the deceased put something in the right pocket of his pants and pat it. The defendant then got his shot gun, loaded it and put other shells in his pocket. Placing the gun

by the front door, he stood in the doorway watching the deceased come toward him. When the deceased got to the back end of the grocery store, across the street from 760 Bradley Street, he put his hand in his right pants pocket. The defendant then picked up the gun, stood in front of the doorway, took aim and shot the deceased, because, as he said, he thought it was time to keep the deceased's hand in his pocket. After the shot he saw the deceased fall to the sidewalk. The defendant then ran out in the back yard, unloaded the gun, threw the exploded shell away and hid the gun in a vacant house. He started to the police station to give himself up, but changed his mind, went to the Camden Market and got a ride with a trucker to North Carolina. He further stated that his former common law wife came to his residence the day before the shooting and wanted to know when he was going back to North Carolina. He denied telling her that her marriage with the deceased would do her no good or otherwise threatening her. He admitted that the deceased did not have a gun in his hand, but thought he had one. He had bought the shot gun in Baltimore in June or July, 1956, to shoot ground hogs in Pennsylvania. His only prior use thereof was to try it out once to see if it worked.

Besides the defendant's statement, the State had introduced the autopsy report, several photographs of the deceased, shot gun patterns and scenes of the shooting, before it closed its case.

The defendant moved for a directed verdict which the court denied, and he elected to produce testimony in his own behalf.

The defendant's testimony in court was substantially the same as his statement to the police. He testified that he had resided in Baltimore off and on for twenty-three years. He admitted several prior convictions. He had lived with his former common law wife for ten years until they separated in May, 1956. He went to New Jersey in July, 1956, got a job and sent her money several times. She visited him in Newark for two nights in August and he gave her money to return to Baltimore. He returned to Baltimore on September 10, 1956, and stayed at 760 Bradley Street with his

aunt. His common law wife visited him there the following day. He did not learn of her intended marriage to the deceased until after the shooting. The defendant admitted seeing the messenger boy, but denied sending a message to his former common law wife. He denied knowing the deceased or seeing him before the day of the shooting. In court he testified that the threat of the deceased to kill him or get killed was made just prior to the shooting instead of after the fight earlier in the morning. His explanation for the killing was that he was acting in self defense. Judge Cullen asked the defendant why he had not gone into the house in order to get away from the deceased. His reply was that he did not think the deceased would come back after the fight. Judge Tucker attempted to have the defendant fix the distance between the defendant and deceased when the shot was fired. He replied that the distance was about as far as the distance from the witness chair to the bench in Criminal Court Part II, which was estimated at approximately fifteen feet. Actually the distance between the door of 760 Bradley Street and the spot where the deceased fell on the opposite sidewalk was approximately thirty-two feet.

The aunt corroborated the defendant's statement that the former common law wife had visited the defendant on September 11, 1956, at 760 Bradley Street. Her son stated that the defendant had been good to his former common law wife and on one occasion had given her $200.00.

The court stated, when it entered its verdict of guilty of murder in the first degree, that the killing was wilful, deliberate and premeditated.

The defendant's appeal presents two questions: (i) was the denial by the trial court of a motion for a directed verdict at the conclusion of the State's evidence reversible error?; and (ii) does all of the evidence in the case support the finding of a verdict of guilty of murder in the first degree?

The question as to the denial by the trial court of the defendant's motion for a directed verdict at the close of the State's case is not properly before us. Maryland Rule 741 b (Directed Verdict at Close of State's Evidence) specifically provides that when the motion is denied "the accused may

offer evidence without having reserved the right to do so but in so doing he withdraws the motion." When the motion was denied, the defendant had a choice either to rest or to produce evidence in his defense. He chose the latter course. Having elected to proceed, the motion was withdrawn, and there is no question of error for us to decide. The motion was not reoffered at the close of all the evidence, but that is unimportant because the defendant having been tried by a court sitting without a jury is entitled to a review upon both the law and the evidence as provided by Rule 741 c (Appeal). He has such right regardless of when he moved for a directed verdict. In fact he need not have made a motion. A motion for a directed verdict in a non-jury case is not a prerequisite for appellate review of the whole case. The mere entry of an appeal, seasonably made, is sufficient for that purpose. *Diggins v. State* (1951), 198 Md. 504, 84 A. 2d 845.

Thus the only question presented by this appeal is whether the trial court was clearly erroneous in finding a verdict of guilty of murder in the first degree.

It is undisputed that the defendant shot and killed the deceased with a blast from a shot gun, which struck the deceased in the head and shoulder. The defendant contends that the evidence is legally insufficient to justify a finding of murder in the first degree, and claims that he shot the deceased in self defense.

Code (1951), Art. 27, sec. 494, provides that:

> "All murder which shall be perpetrated by means of poison, or lying in wait, or by *any kind* of wilful, deliberate and premeditated killing shall be murder in the first degree." (Italics supplied.)

The law of homicide in this State was so well defined by Judge Hammond, speaking for this Court, in *Chisley v. State* (1953), 202 Md. 87, 95 A. 2d 577, that it would be repetitious to go into detail here. It will suffice to reiterate that since murder is the unlawful killing of a human being with malice aforethought, the law presumes that all homicides are committed with malice aforethought and constitute murder, the burden being on the accused to show circumstances of

160

alleviation, excuse or justification to reduce the offense to manslaughter. *Chisley v. State, supra.* And where the law divides murder into grades, as it does in this State, such a homicide is presumed to be murder in the second degree and the burden is on the State to show that the killing was wilful, deliberate and premeditated, if the offense is to be elevated to murder in the first degree under Section 494, *supra.* *Chisley v. State, supra.* To be "wilful" there must be a specific purpose and design to kill. To be "deliberate" there must be full and conscious knowledge of the purpose to kill. To be "premeditated" the design must have preceded the killing by a sufficient length of time, even though short, to be deliberate. *Chisley v. State, supra; Grammer v. State* (1953), 203 Md. 200, 100 A. 2d 257; *Faulcon v. State* (1956), 211 Md. 249, 126 A. 2d 858.

In order to justify a conviction of murder in the first degree in this case, the trial court must have found (i) that the defendant had an actual intent to kill, (ii) that he had fully formed a purpose to kill, and (iii) that he had enough time to deliberate and premeditate the killing. We think there was sufficient evidence for the trial court to have found the existence of all three elements. Even according to defendant's own statement he had watched the deceased from the door of his aunt's house, and, after getting the shot gun and loading it, he resumed watching the deceased come across, first Ogston, and then Bradley Streets, into the range of the shot gun when he stood in front of the doorway, took aim and fired. If the defendant had not deliberated before, there was time enough to consider and plan the killing between the deceased's act of leaving 504 Ogston Street and his coming within range of the assassin's shot gun on Bradley Street. As we have already stated, the State produced other evidence, not only of deliberation and premeditation, but also of the actual intent and fully formed purpose to kill.

We find little merit in the defendant's contention that the prosecution was based on the concept that the killing was perpetrated by "lying in wait", inferring that the State failed to prove a wilful, deliberate and premeditated killing. The

State admits that this was one of the theories developed by the police, which would have had more substance had the former common law wife become the victim instead of the deceased. But, regardless of whatever theories may have been advanced the fact remains that the trial court, in finding a verdict of guilty of murder in the first degree, stated that the killing was "wilful, deliberate and premeditated". Nor is there much substance in the contention that the testimony of the messenger boy constituted the only evidence which could possibly prove murder in the first degree. As the State points out the defendant overlooked the testimony of the former common law wife to the effect that she had been warned by the defendant that her marriage to the deceased would do her no good. Moreover, it is clear, we believe, even without the testimony of the former common law wife and the messenger boy, enough legally sufficient testimony remained for the trial court to find the defendant guilty beyond a reasonable doubt of first degree murder.

There remains only the defendant's claim that he shot and killed the deceased in self defense. That contention was squarely before the trial court and was rejected by it. We think the evidence clearly permitted the rejection.

It was the duty of the court sitting without a jury to render such verdict as it thought right upon the evidence and the law. Rule 741 a (Trial by the Court—Verdict). And the verdict of the trial court may not be set aside on the evidence unless the finding was clearly erroneous. Rule 741 c (Appeal). We think that the evidence was clearly sufficient to sustain the conviction.

*Judgment affirmed.*