668 A.2d 970

**Edward Claire REISCH**

v.

**STATE of Maryland.**

**No. 278 Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 28, 1995.

Edward Claire Reisch, Baltimore, for Appellant.

Rachel Marblestone Kamins, Assistant Attorney General, Baltimore (J. Joseph Curran, Jr., Attorney General, Baltimore, and Sandra A. O'Connor, State's Attorney for Baltimore County, Towson, on the brief.), for Appellee.

Submitted before FISCHER, CATHELL and HOLLANDER, JJ.

HOLLANDER, Judge.

In 1992, Edward Claire Reisch, appellant, was charged with two home improvement offenses, in violation of Code, Art. 56, §§ 255 and 261 (1957, 1988 Repl.Vol.). After a bench trial in 1995 in the Circuit Court for Baltimore County,[1] appellant was convicted of operating without a home improvement license [2] and sentenced to six months in the Baltimore County Detention Center, pursuant to Art. 56, § 267. He was also ordered to pay restitution of $18,830.00, a fine of $350.00, and court

---

1. This is appellant's second appeal to this Court. In an unreported opinion filed May 20, 1994, a panel of this Court determined that appellant's earlier convictions, entered after a "not guilty statement of facts" proceeding, were obtained in violation of Maryland Rule 4–242(c). Accordingly, we vacated his convictions and remanded for a new trial.

2. The docket entries actually indicate that appellant was found guilty of both count 1, which charged him with non-performance of the contract, and Count 2, which charged him with operating without a home improvement license. But the record also reflects the following statement by the court: "I find him guilty of Count 1, which is operating and contracting to do work without a home improvement license. On the second count, the non-performance, I'm in a state of unknown as to whether he was ordered off the job or whether he abandoned the job, so for that I find him not guilty." The docket entries also reflect a suspended two year sentence for non-performance, and a consecutive six month sentence for the licensure offense.

costs of $225.00. Appellant's sentence was to be served in home confinement, with all costs to be paid by appellant.

Appellant filed a *pro se* appeal and, in his "Questions Presented," he states:

"1. The evidence adduced at trial was legally insufficient to sustain a conviction of not having a home improvement license.

2. Appellant was exempted from requirements for needing a home improvement license.

3. No criminal intent.

4. If anything the issue is a Civil matter not Criminal."

### *Factual Summary*

On April 21, 1992, appellant, owner of a business called Unleading America, entered into a contract with George Stuart Lacher to remove lead paint from Lacher's house. The house, which was built in 1880, was approximately 5000–6000 square feet in size. Lacher learned of appellant's company through information furnished to him by the Maryland Department of the Environment ("DOE").

The contract provided, *inter alia,* for removal of "all existing paint" from the exterior of the house through use of "a high-pressure waterwash" and chemical stripping. In addition, Reisch agreed to remove the paint from specified interior portions of the house. The contract further obligated appellant to contain loose lead paint particles and to remove lead dust by various methods. In addition, Reisch agreed to repaint the entire exterior of the house and remove "existing screens and replace with either aluminum or fiberglass screening." The total contract price was $27,000.00, payable in three installments. The contract also contained an option for "sash chain installation," at additional expense.

In May 1992, Reisch began the work. Testimony at trial from Lacher and appellant differs in terms of the quality of work that was done, when the work was done, and whether it was done in accordance with contract specifications.

According to Lacher, appellant began work on the exterior of the house by blasting it with water to remove the existing paint. But appellant lined only certain areas of the ground with plastic to contain lead contaminated paint removed by the blasting. Lacher also contended that the plastic lining did not effectively contain paint chips, many of which were strewn around the property. Further, he claimed that no measures were taken to contain paint removed from the exterior of the Lacher garage.

In his testimony, Lacher said that the paint was never completely removed from the exterior of the house, as required by the contract. He also maintained that appellant removed the screens from the porches, but the screens were never returned. He added that appellant spray painted the storm windows, the stone foundation, and the roof. Regarding the interior of the house, Lacher stated that appellant's work was limited to the windows in two bedrooms. Lacher further denied that he asked Reisch to do any additional work beyond the terms of the contract.

Lacher also contended that, after he had paid appellant the second installment on or about May 15, 1992, the work basically ceased. In an effort to effect contract completion, Lacher related that he called appellant at least once a day because no work was being done. When appellant failed to complete the work by early July, Lacher hired another painter to finish the job. In July 1992, Lacher barred appellant from returning to Lacher's property.

On July 13, 1992, Lacher filed a complaint against appellant with the Maryland Home Improvement Commission. He alleged, *inter alia*, that appellant failed to abate safely the lead paint from the exterior of his house, and that Reisch had more than two thirds of his money but only completed one third of the work. Robert Earl Hoggard, an investigator for the Home Improvement Commission, testified that appellant was not a licensed home improvement contractor at the relevant time.

Appellant testified in his own defense. He said that the scope of work on the Lacher home included interior and exterior paint removal, including approximately 950 square feet of interior work. Although not particularized in the contract, he nonetheless claimed that the interior work included painting the walls, painting the woodwork, taking the doors down, rehanging cupboard doors, and painting the cupboard doors and all of the shelves.[3] Appellant further stated that he began with the interior work because Lacher wanted the inside lead abatement work completed before Lacher's then-expectant wife delivered.

Reisch also testified that he properly contained lead chips removed from the exterior of the house. Appellant conceded, however, that his "crew" failed to adhere to prescribed containment procedures in removing paint from the garage. But, when the problem was discovered, he brought a crew to the property and it was entirely cleaned. Furthermore, appellant testified that what Lacher referred to as spray painting was actually an "overspray," a procedure utilized "when you do any treatment with lead," the purpose of which was to seal the exterior surface prior to painting to ensure a "good bond." He also claimed that the "job got more involved" because there were so many problems with the condition of the house that only became apparent once the work began.[4] He asserted, too, that the porch screens were repaired and returned. Although he claimed that inclement weather hampered the progress of the work, he said that he was always ready and able to finish the job.

---

3. Lacher did not describe or mention that Reisch rehung cupboard doors or that he did any interior work besides removing paint from windows.

4. For example, Reisch said: "Once we got into the work and started removing the paint, the cedar shakes were in very bad condition and needed to be taken care of, because you have to have primer to bond the seal, so we used a special product which is applied by hand with a scraper, and so I came across and textured it, and I did that and three of the people on my crew did that. . . ."

Appellant acknowledged that he performed some additional work not specifically addressed in the contract. He stated that he repaired a concrete pad at the rear of the house, replaced two glass window panes, planed a door, and repaired windows that were not operating properly. Appellant explained that he repaired the concrete pad near the garage in an effort to seal the soil after its contamination from lead paint chips. Appellant further said that he performed additional work outside the contract because Lacher requested it.

Although appellant conceded that he did not have a home improvement license when he performed the work on the Lacher home, he insisted that he "was properly licensed for everything," because he had complied with DOE requirements and was properly certified as a lead abatement contractor, in accordance with the Code of Maryland Regulations (COMAR). He offered in evidence two certificates reflecting successful completion of courses in lead abatement, in accordance with HUD and DOE guidelines. Appellant also submitted in evidence a May 1992 list of lead abatement contractors, prepared by the Lead Poisoning Prevention Division ("LPPD") of DOE and circulated to "homeowners and others seeking qualified lead paint abatement contractors;" appellant's business, Unleading America, was second on DOE's list. Although the list specifies that DOE does not endorse any of the contractors, it also states that "all workers on a lead-abatement project must have successfully completed lead abatement training . . . pursuant to COMAR 26.02.07.11B." In addition, appellant introduced a letter dated October 19, 1992 to Unleading America from Pat McLaine, Chief of LLPD, that stated, in part: "The list is widely circulated among homeowners and others seeking qualified lead paint abatement contractors. Your company is currently included on this list." Finally, Reisch offered documents from the Home Improvement Commission. While expressly stating that the list is "not all inclusive," the Commission referenced 90 categories of work for which a home improvement license was required, and lead abatement was not included on the list.

The trial court found that appellant was not properly licensed on the date of contract formation, that "he should have been licensed," and that "passing [COMAR and DOE] tests and regulations [just indicates] that he can do [lead abatement], but he definitely needs a [home-improvement] license." The trial judge said that "when you engage in the home improvement business without benefit of a license, you take a big gamble." Further, the court observed that, even if Reisch were licensed to perform lead abatement or was otherwise deemed qualified by a State agency to perform lead abatement, such agency "cannot issue any order that will abridge the Home Improvement Commission." The court further noted, "Well, the State of Maryland could approve me as a licensed well digger, but I'd still have to have a home improvement license."

## *Discussion*

It is undisputed that the primary purpose for which appellant was hired was lead paint abatement and most of the work that he performed was related to lead abatement. Nevertheless, the State contends that because appellant also performed work encompassed by the home improvement laws and was not licensed, he is criminally liable.[5]

In defense, appellant contends that he is exempt from the home improvement licensing requirement, because his "qualifications qualify him for an exception." He also argues that he was lawfully entitled to engage in lead abatement without a home improvement license, because he had appropriate certification in lead abatement from the DOE, in accordance with COMAR 26.02.07.11. He contends, too, that the evidence was not sufficient to sustain his conviction, essentially because he did not know that he needed a home improvement license and he did not intend to violate the law. We shall address the various issues together, because they are intertwined.

---

**5.** At trial, the State did not particularize the work that it contends constituted "home improvement."

## I.

Appellant was charged with violating Code, Art. 56, § 255, because he performed home improvement work without a license.[6] Section 249(c) defined "home improvement" as follows:

"Home improvement" means the repair, replacement, remodeling, alteration, conversion, modernization, improvement, or addition to any land or building, or that portion thereof which is used or designed to be used as a residence or dwelling place for 1, 2, or 3 single family units; and shall include the construction, replacement, or improvement of driveways, swimming pools, porches, garages, landscaping, fences, fallout shelters and other improvements to structures or upon land which is adjacent to a dwelling house . . . ."

Further, Art. 56, § 255(a) provided, in part, that "no person shall act in the capacity of a contractor . . . unless authorized to do so by . . . license . . . in accordance with the provisions of this subtitle." [7] There is no dispute that appellant did not possess such a license. But, he argues that the work that he performed was "lead abatement;" because he was "required by State law to meet standards of competency or experience" to perform lead abatement, he did not know that he was also required to have a home improvement license. He also argues

---

6. Effective October 1, 1992, the provisions of Art. 56 relating to home improvement and licensure were repealed and recodified, without substantive change, in Title 8 of the Business Regulation Article. In our review of the record, we cannot find any reference to the particular statutory violation for which appellant was ultimately convicted in 1995. The court's remarks at the time of verdict and sentencing do not refer to the statutory section. Nor does the docket sheet specify the particular section. There is, however, an unlabeled worksheet in the court file, that refers to Article 56, not Title 8. Although the parties' briefs refer exclusively to Code, Business Regulation Article, we shall refer to Art. 56, because it was in effect when the contract was executed and when appellant was charged.

7. Similarly, under Md.Code Ann., Bus.Reg. § 8–301(a) (1992 & Supp. 1995), which is now in effect, "a person must have a contractor license whenever the person acts as a contractor in the State."

that his DOE certification exempted him from the requirement to obtain, concurrently, a home improvement license.

The trial court determined that the contract included work that constituted home improvement. Accordingly, the trial court found that appellant violated the law. The court said:

> Well, the defendant is charged with, one, not having a home improvement license as of April of 1992. The contract was dated April 21, 1992. I find that he was not licensed as of that date by his own admission and that he should have been licensed, and that this window that is referred to that creates a, quote, doubt, is not sufficient to overcome the wording of this contract that included the work that was beyond the lead paint removal.

> Mr. Reisch, the defendant, is relying upon the State of Maryland claiming or offering him as someone who can provide this service for lead paint removal, he's the second one on the list, but that does not license him, that just states that he has passed those tests and regulations and that he can do it, but he definitely needs a license.

■ Appellant claims exemption under Art. 56, § 256 of the Code, which provided:

> No contractor's ... license may be required of any person when acting in the particular capacity or particular type of transaction set forth in this section:
>
>      *      *      *      *      *      *
>
> (2) A plumber, electrician, architect or *any other such person* who is required by State or local law to attain standards of competency or experience as a prerequisite to engaging in such craft or profession, *and who is acting exclusively* within the scope of the craft or profession *for which he is currently licensed* pursuant to such other law.

(Emphasis added.)

We conclude that, if appellant engaged in home improvement work, he is not entitled to protection or exemption under § 256(2). Even if appellant satisfied the statutory requirement of exclusivity, he was not *licensed* in any other profes-

sion, pursuant to any other law. A DOE certification does not constitute a license within the meaning of Art. 56, § 256(2).

## II.

■ Appellant also contends that he had "no criminal intent," and that he did not "knowingly or wilfully" commit any crime. At trial, his counsel asserted that "part of the defense in this case is that this would not have been a wilful breach of the home improvement law." Therefore, appellant argues that the evidence was insufficient to sustain his conviction, even if he was unlicensed.

Notwithstanding appellant's admitted failure to obtain a home improvement license, we agree that the evidence was insufficient to sustain appellant's conviction. We rest our conclusion on the State's failure to establish, beyond a reasonable doubt, that Reisch acted *knowingly* and *wilfully*. Based on express statutory language, we reject any claim that the terms "knowingly and wilfully" are mere surplusage or that the home improvement provisions in issue impose strict criminal liability. We explain.

The Legislature specifically predicated a criminal penalty for violation of Maryland's home improvement laws on a *knowing* and *wilful* violation, referencing that language in several key places in the home improvement laws then in effect:

> No person may engage in or transact any home-improvement business, or hold himself out to the public as doing home-improvement business, or offer to transact any home-improvement business, in this State, except in compliance with the applicable provisions of this subtitle. No person, whether subject to licensing by any law or otherwise, may engage in this State in any trade practice or other act which is prohibited by any provisions of this subtitle; and every person who *wilfully* participates in a prohibited act or violation with knowledge of the same is subject to the criminal penalty therefor. The provisions of this subtitle may not be waived by agreement.

Md.Ann.Code art. 56, § 246 (1962, 1988 Repl.Vol.) (emphasis added).

> Any persons who shall *knowingly and wilfully* engage in the home-improvement business as a salesman, subcontractor, or contractor without obtaining a license as required by this subtitle and who is not otherwise exempted from the licensing requirement and any person who continues in business as a ... contractor, after revocation or during suspension shall be punished by a fine not exceeding $5,000 or imprisonment for not exceeding 2 years, or both.

Md.Ann.Code Art. 56, § 267 (1978, 1988 Repl.Vol.) (emphasis added).

> Any person who *knowingly and wilfully* violates any provision of this subtitle, with respect to which a greater penalty is not otherwise provided ... is guilty of a misdemeanor, and upon conviction thereof ... shall be punished by a fine not exceeding $1,000 or imprisonment not to exceed 6 months or both.

Md.Ann.Code Art. 56, § 268 (1963, 1988 Repl.Vol.) (emphasis added).[8]

We recognize that "[t]he general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system." *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991). Nor do we seek here to "dishonor the venerable principle that ignorance of the law generally is no defense to a criminal charge." *Ratzlaf v. United States*, 510 U.S. ——, ——, 114 S.Ct. 655, 663, 126 L.Ed.2d 615, 627 (1994). Nonetheless, at common law, a crime was deemed to

---

**8.** The penalty sections in Art. 56, §§ 267 and 268 correspond with the penalty provisions in the Business Regulation article. Md.Code Ann., Bus.Reg. § 8–601(d) (1992) provides: "A person who knowingly and willfully violates this section is guilty of a misdemeanor and ... is subject to a fine not exceeding $5,000 or imprisonment not exceeding 2 years or both." Md.Code Ann., Bus.Reg. § 8–623(b) (1992) states: "A person who knowingly and willfully violates this title is guilty of a misdemeanor and, on conviction, is subject to a fine not exceeding $1,000 or imprisonment not exceeding 6 months or both."

have occurred only when an individual committed an unlawful act with a guilty state of mind. *Dawkins v. State,* 313 Md. 638, 643, 547 A.2d 1041 (1988). "[I]t is well understood that generally there are two components of every crime, the *actus reus* or guilty act and the *mens rea* or the guilty mind or mental state accompanying a forbidden act. The requirement that an accused have acted with a culpable mental state is an axiom of criminal jurisprudence." *Garnett v. State,* 332 Md. 571, 577–578, 632 A.2d 797 (1993). *See also, Morissette v. United States,* 342 U.S. 246, 250–252, 72 S.Ct. 240, 243–244, 96 L.Ed. 288 (1952).

In our view, two recent Supreme Court cases, not cited by the parties, elucidate the issue of wilfulness and convince us that the statutory terms cannot be disregarded. These cases support our conclusion that, in the absence of proof that Reisch acted wilfully, i.e., with the intent to violate a *known* legal duty, his conviction cannot be sustained. In *Ratzlaf v. United States, supra,* 510 U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615, the defendant intended to circumvent the bank's reporting requirement for cash transactions in excess of $10,-000.00, but he did not know that his conduct was unlawful. The Court held that, in a prosecution under 31 U.S.C. § 5322(a), the Government was required to prove that the defendant *knew* that it was unlawful to structure cash transactions so as to evade the bank's reporting requirement, because the statute provided that only "a person *wilfully* violating" the provision is subject to criminal penalties. Although the Court acknowledged that term "wilful" may have many meanings, the Court was of the view that the element of wilfulness was not satisfied in the absence of "knowledge of the reporting requirement" and a "specific intent to commit the crime, i.e., 'a purpose to disobey the law.' " *Id.,* 510 U.S. at ——, 114 S.Ct. at 659, 126 L.Ed.2d at 622. Rejecting any suggestion that the term "wilfulness" was "surplusage," *Id.,* 510 U.S. at ——, 114 S.Ct. at 659, 126 L.Ed.2d at 622, and "to give effect to the statutory 'wilfulness' specification," *Id.,* 510 U.S. at ——, 114 S.Ct. at 658, 126 L.Ed.2d at 620, the Court stated: "Judges should hesitate so to treat statutory terms in any setting, and

resistance should be heightened when the words describe an element of a criminal offense." *Id.*, 510 U.S. at ——, 114 S.Ct. at 659, 126 L.Ed.2d at 622.

The case of *Cheek v. United States, supra,* 498 U.S. 192, 111 S.Ct. 604 is also instructive. There, the defendant was federally prosecuted for failing to file federal income tax returns and for wilfully attempting to evade his income taxes. 26 U.S.C. § 7201 provides penalties for any person "who *willfully* attempts in any matter to evade or defeat any tax imposed ...," and 26 U.S.C. § 7203 provides penalties for "[a]ny person ... who *willfully* fails to make such return." (Emphasis added). While the defendant knew that he had not filed his returns, he claimed that he had not acted wilfully, within the meaning of the statute, because he believed that the federal tax laws were unconstitutionally enforced, that his actions were lawful, and that "wages" are not income within the meaning of the federal income tax What the Court said is pertinent here:

> The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common-law presumption [regarding ignorance of the law] by making specific intent to violate the law an element of certain federal criminal tax offenses. Thus, the Court almost 60 years ago interpreted the statutory term "willfully" as used in the federal criminal tax statutes as carving out an exception to the traditional rule. This special treatment of criminal tax offenses is largely due to the complexity of the tax laws.

498 U.S. at 199–200, 111 S.Ct. at 609.

After reviewing various interpretations of the term "wilfully," the Court said that "the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.' " *Id.*, 498 U.S. at 201, 111 S.Ct. at 610. Thus, it held that the Government was required to prove that

the defendant knew of the duty that the law imposed upon him and that he voluntarily and intentionally violated that duty.

We also conclude that Art. 56, § 255 does not constitute a strict liability criminal offense. Therefore, the State was required to establish *mens rea.*

■ Strict liability criminal offenses that do not require *mens rea* were generally enacted in response "to the demands of public health and welfare arising from the complexities of society after the Industrial Revolution. Typically misdemeanors involving only fines or other light penalties, these strict liability laws regulated food, milk, liquor, medicines and drugs, securities, motor vehicles and traffic, the labeling of goods for sale, and the like." *Garnett,* 332 Md. at 578, 632 A.2d 797. *See also Dawkins,* 313 Md. at 644–645, 547 A.2d 1041. But, as the Court of Appeals has acknowledged, "the contemporary view ... disfavors strict liability offenses." *Dawkins,* 313 Md. at 650, 547 A.2d 1041. *See also, Garnett,* 332 Md. at 579, 632 A.2d 797 ("Modern scholars generally reject the concept of strict criminal liability"); *State v. McCallum,* 321 Md. 451, 456, 583 A.2d 250 (1991).

We recognize that, in *Harry Berenter, Inc. v. Berman,* 258 Md. 290, 265 A.2d 759 (1970), the Court of Appeals specifically determined that the Maryland Home Improvement Law is regulatory in nature, and "that contracts made by unlicensed persons subject to the statute are illegal as against public policy and will not be enforced." *Id.,* 258 Md. at 298, 265 A.2d 759. Consequently, the Court there rejected the contractor's claim, in a *civil* case, to recover money that he alleged was owed to him. But this is a criminal proceeding and thus *Harry Berenter, Inc.* is distinguishable.

■ Although the statute here has characteristics that are regulatory in nature, *see, e.g., Dawkins,* 313 Md. at 644, 547 A.2d 1041; *McCallum,* 321 Md. at 456, 583 A.2d 250; *Harry Berenter, Inc.,* 258 Md. at 294, 265 A.2d 759, it is also punitive. Indeed, a maximum period of incarceration of two years is not a "light" penalty, and this factor militates against characterizing the statute as a strict liability " 'public welfare' offense." *McCallum,* 321 Md. at 457, 583 A.2d 250. When, as here, "the

statute is both remedial and penal, the remedial portion may be construed liberally while the penal provisions must be strictly construed in favor of the accused and against the State." *Shade v. State*, 306 Md. 372, 379, 509 A.2d 664 (1986). *See also Garnett*, 332 Md. at 585, 632 A.2d 797; *Briggs v. State*, 289 Md. 23, 31–32, 421 A.2d 1369 (1980). We find several cases persuasive here.

In *Garnett*, the Court construed Maryland's "statutory rape" law, codified at Article 27, § 463(a)(3), which did not expressly mention knowledge, intent or scienter. The Court considered whether the State was required to prove that the defendant knew the victim was younger than 14 years of age and whether the trial court erred in excluding evidence that the defendant had been told, and believed, that the victim was actually 16 years of age. Relying on "the plain language of § 463, viewed in its entirety, and the legislative history of its creation....", *id.*, 332 Md. at 585, 632 A.2d 797, the Court held that the statute constituted a strict liability offense and, therefore, the State did not have to prove the defendant's *mens rea*. *Id.* Consequently, the mistake-of-age defense was not available to the accused.

In contrast to this case, in *Garnett* the statute was silent as to *mens rea*, which the Court attributed to legislative design. The Court contrasted § 463(a)(3) with § 463(a)(2), where the Legislature "expressly provided as an element of [that] offense that 'the person performing the act *knows or should reasonably know* the other person is mentally defective....'" *Id.* at 585, 632 A.2d 797 (emphasis in *Garnett*). Thus,

"the Legislature showed itself perfectly capable of recognizing and allowing for a defense that obviates criminal intent; if the defendant objectively did not understand that the sex partner was impaired, there is no crime. That it chose not to include similar language in subsection (a)(3) indicates that the Legislature aimed to make statutory rape ... a more severe prohibition based on strict criminal liability."

*Id.* at 585–86, 632 A.2d 797.

In *Dawkins*, the Court considered whether scienter is an element of the offense of drug possession. Construing Art.

27, §§ 277(s), 287(a), 287(d), which did not contain language specifically indicating that scienter was an element of a § 287 drug possession offense, the Court nevertheless concluded that the statutes proscribe only knowing and intentional possession. *Id.,* 313 Md. at 649, 547 A.2d 1041. Again, the Court focused on the statutory scheme, which it felt "indicate[d] an intention on the part of the General Assembly to require *scienter* as an element of the § 287 offenses.... Thus, the statutory scheme implies a 'knowing' possession on the part of the accused." *Id.* (Italics in original). Consequently, the Court held that knowledge is an element of the offenses. *Id.* at 651, 547 A.2d 1041. Moreover, in rejecting a view of the statute as regulatory in nature, the Court considered the severity of the possible penalty of four years of incarceration. *Id.* at 647, 651, 547 A.2d 1041.

▉ In striking contrast to *Dawkins* and *Garnett,* a fair reading of the home improvement laws in issue does not lead to strict criminal liability construction. In our effort to discern the Legislature's intent, we do not find any indication that it intended to eliminate the State's burden to establish *mens rea* in a prosecution under art. 56, § 255 or that it sought to create a strict criminal liability public welfare offense. To the contrary, as we have observed, Art. 56, §§ 267 and 268 both contain language specifically and expressly requiring scienter. Therefore, we shall follow the well settled rule that the words of a statute should be given their ordinary and natural meaning, absent evidence that a contrary interpretation is warranted. *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994); *Garnett,* 332 Md. at 585, 632 A.2d 797; *Comptroller of the Treasury v. Jameson,* 332 Md. 723, 732–33, 633 A.2d 93 (1993); *Chesapeake Indus. Leasing Co. v. Comptroller of the Treasury,* 331 Md. 428, 440, 628 A.2d 234 (1993); *Fairbanks v. McCarter,* 330 Md. 39, 46, 622 A.2d 121 (1993); *Williams v. State,* 329 Md. 1, 15, 616 A.2d 1275 (1992); *Dickerson v. State,* 324 Md. 163, 171, 596 A.2d 648 (1991).

The case of *Shade v. State,* 306 Md. 372, 509 A.2d 664 (1986) is also instructive. There, the Court reviewed the history of the Maryland Home Improvement Law and focused on abandonment or failure to perform as proscribed by Art. 56, § 261. *Id,.* 306 Md. at 377–79, 509 A.2d 664. Although the Court observed that the contractor in question was "woefully inept" and the work was "grossly defective" and "inadequate," *id.,* 306 Md. at 382, 509 A.2d 664, it nevertheless concluded that the evidence was legally insufficient to support an inference of an *intent* to abandon the contract. *Id.* Of particular significance here, the Court determined that the State did not establish a *knowing* and *wilful* abandonment. *Id.* 306 Md. at 383, 509 A.2d 664.

■ Our inquiry is next directed to whether the State adequately proved a knowing and wilful violation of the licensing requirement. Based on settled interpretations of the term "wilfully," we are satisfied that the evidence was insufficient to sustain Reisch's conviction.

Surely, appellant knew that he did not possess a home improvement license. But the question is whether appellant's failure to obtain a home improvement license compels a finding of a knowing and wilful failure to obtain a license, in violation of §§ 267 and 268.

As our framework, we are mindful of the Supreme Court's analysis of the concept of wilfulness in *Cheek.* Moreover, in *Ewell v. State,* 207 Md. 288, 299, 114 A.2d 66 (1955), the Court of Appeals said that "[t]he term 'wilfully' in criminal statutes ... characterize[s] an act done with deliberate intention for which there is no reasonable excuse...." (citation omitted). *See also Elliott v. State,* 215 Md. 152, 160, 137 A.2d 130 (1957).

In *Fearnow v. Chesapeake & Potomac Telephone Co.,* 104 Md.App. 1, 655 A.2d 1, *cert. granted,* 339 Md. 445, 663 A.2d 1271 (1995), involving a civil action based on the Maryland Wiretapping and Electronic Surveillance Act, Md.Code Ann., Cts. & Jud.Proc. § 10–401 *et seq.,* plaintiff sought to recover for the wilful interception of his telephone communications. Judge Harrell, writing for this Court, observed that the "term

'wilfully' means 'more than intentional or voluntary.' It denotes either an intentional violation or a reckless disregard of a known legal duty." *Id.*, 104 Md.App. at 23, 655 A.2d 1 (citation omitted). Relying on *Earley v. Smoot*, 846 F.Supp. 451, 453 (D.Md.1994) (interpreting the Maryland Wiretap Act), we also said that, to constitute a wilful act, "the violator must know that what he or she is doing is illegal." *Id.* at 24, 655 A.2d 1.[9]

For offenses prohibiting the failure to act, such as failure to obtain a license, the term "wilful" is "commonly interpreted" as an *intentional* or *deliberate* failure. *See Hoey v. State*, 311 Md. 473, 492, 536 A.2d 622 (1988); *Brown v. State*, 285 Md. 469, 474-75, 403 A.2d 788 (1979). Similarly, the term wilful has been used to characterize an act done with *"deliberate intention"*. *Cover v. Taliaferro*, 142 Md. 586, 596, 122 A. 2 (1923) (cited with approval in *Shell v. State*, 307 Md. 46, 66,

---

**9.** In Aronson, *Maryland Criminal Jury Instructions and Commentary*, § 3.03 (1988), "knowingly" is defined as follows:

> "Knowingly" is generally defined as having knowledge. An act is done knowingly if done voluntarily and purposely, and not because of mistake, accident, inadvertence or other innocent reason. The purpose of the word "knowingly" is to ensure that no one would be convicted for an act done where there exists a reasonable, innocent explanation. The State has the burden of proving knowledge beyond a reasonable doubt. Knowledge can be established from all the surrounding facts and circumstances of the case. A person may be found to have knowledge where he acts with an unlawful purpose and deliberately ignores the obvious.

Further, Aronson defines "willfully" in § 3.04 as follows:

> "Willfully" characterizes an act which is done knowingly, with deliberate intention and for which there is no reasonable excuse. The element of deliberate intention requires that there be a full and conscious design to do an act which is a violation of the law. An act that is done merely accidentally, inadvertently, or negligently is not done willfully.

The Maryland Criminal Pattern Jury Instructions do not contain any general instructions defining "willfully." Rather, the instructions and commentary for particular offenses contain definitions of the term in the context of those crimes. *See, e.g., id.* at 103 (arson; "[w]ilfully" means intentionally, knowingly and purposely); *Id.* at 104 (arson; "wilful requires a deliberate intent to injure another's property,") citing *Shell v. State*, 307 Md. 46, 65–68, 512 A.2d 358 (1986)); *Id.* at 217 (first degree murder; "[w]ilful means that the defendant actually intended to kill the victim."); *Id.* at 285 (malicious destruction of

512 A.2d 358 (1986)). *See also In re Taka C.,* 331 Md. 80, 84, 626 A.2d 366 (1993) (deliberate intent requires more than the intent to do the act which leads to the harm; it requires that the defendant actually intended to cause the harm); *Rosenberg v. State,* 164 Md. 473, 476, 165 A. 306 (1933).

The determination of wilfulness is ordinarily a matter for the fact-finder *Fearnow,* 104 Md.App. at 27, 655 A.2d 1. But the trial court here never specifically addressed the issue of wilfulness. Accordingly, we conclude that the State's evidence was legally insufficient to prove that appellant acted wilfully.

The evidence is undisputed that appellant was trained in lead abatement and received appropriate certification from DOE to perform lead abatement projects. COMAR 26.02.07.11 (1988).[10] COMAR 26.02.07.11A, which was in effect at the relevant time, required "all workers involved in a lead abatement project [to] have taken a qualifying training course which meets the requirements set out in § B, and have received a certificate of completion." Moreover, the Home Improvement Commission did not even list lead abatement on its laundry list of 90 categories of work for which its license was required.

That appellant obtained certification for lead abatement from DOE, was hired by Lacher for that purpose, and knew that his company was one of many lead abatement businesses contained on a list circulated by DOE, coupled with the absence of lead abatement on the Commission's own list, all constitute strong evidence that appellant did not knowingly and wilfully violate the home improvement laws. Additionally,

---

property; " 'wilful' requires a deliberate intent to injure another's property").

**10.** We note that, effective July 1, 1993, the Legislature established the Lead Paint Abatement Services Accreditation Program. *See generally* Code, Environment, § 6–1001 *et. seq.* It constitutes the State's certification program required under the federal Residential Lead–Based Paint Hazard Reduction Act of 1992, Pub.L. 102–550, Title X, 106 Stat. 3897, which was effective as of October 28, 1992. In Maryland, a contractor may not provide lead abatement services unless accredited by DOE. Code, Environment § 6–1002. Pursuant to § 6–1005, violations may be enforced through the civil, administrative and criminal penalty provisions set forth in Environment, §§ 6–420–422 (asbestos) and § 7–266(b) (hazardous substances).

given his training and certification, appellant probably would have been able to obtain a home improvement license if he had understood that he was required to be licensed. Nor was it plausible that Reisch had any reason to suspect that he might endanger public safety by operating as an unlicensed home improvement contractor.

Since Reisch complied with the lead abatement certification requirements, he had "no reason to suspect that he was endangering the public...." *McCallum,* 321 Md. at 457, 583 A.2d 250 (driving while suspended is not a public welfare offense and Legislature did not intend to eliminate scienter requirement; *mens rea* required). "Thus, an accused cannot be found guilty of a criminal offense unless the act with which he is charged comes plainly within both the letter and spirit of the statute under which he is charged." *Shade,* 306 Md. at 380, 509 A.2d 664 (citations omitted).

It is also salient that neither the COMAR provisions pertaining to lead abatement (COMAR 26.02.07.01—26.02.07.14 (1988)), nor the Home Improvement Laws contained in art. 56, make any reference to each other. What the Court of Appeals said in *Mayor of Baltimore v. Clerk of the Superior Court,* 270 Md. 316, 319, 311 A.2d 261 (1973) (cited with approval in *Mayor of Baltimore v. Chertkof,* 293 Md. 32, 46, 441 A.2d 1044 (1982)), is noteworthy here:

[W]hen two acts of the General Assembly covering similar subject matter make no reference to each other, if it is at all feasible, they will be construed so as to give as full an effect to each other as possible.... In order for one statute to alter or limit another, the intention of the Legislature to do so must be clear and manifest; otherwise, the requirements of one will be construed as embodying the provisions of the other.

(Citation omitted).

Further, there is ample language in COMAR indicating that, with the possible exception of work on the glass and the repair of the concrete, virtually all of the work appellant performed was at least *related* to lead abatement. *See* CO-

MAR 26.02.07.02B(8)(12) (" 'Lead abatement project' means any work performed in order to abate the presence of a lead-containing substance"); ('woodwork' means all wooden or metal interior or exterior fittings or ornamentation, such as moldings, doors, staircases, and window sashes and trim"); COMAR 26.02.07.08C (after the required cleaning and inspection, "every contractor shall repaint ... or recoat"); COMAR 26.02.07.03.B.5 ("Windows Generally. Windows, when abated, shall be completely treated, including inside, outside and sides of sashes. Window frames shall be abated to the outside edge of the frame, including slides, sash guides and window wells"). Moreover, appellant contended that he repaired the concrete slab to seal lead contaminated soil, and his testimony was uncontroverted.[11]

Even in the light most favorable to the State, we do not find in the State's case sufficient evidence to establish, beyond a reasonable doubt, a knowing and *wilful* violation. Therefore, appellant's conviction cannot stand.[12]

**JUDGMENT REVERSED.**

**COSTS TO BE PAID BY BALTIMORE COUNTY.**

---

**11.** On the basis of the record, we cannot determine why it was necessary for appellant to plane the door or replace glass panes. Certainly, the repairs could have been necessitated by the lead abatement. For example, in removing lead from the windows, appellant may have broken the panes. He may also have had to plane the door because of the re-painting that followed the lead removal.

**12.** We express no opinion, however, on any civil remedies that Lacher may have been entitled to pursue.