Dear Dr. Bass:
You have requested our opinion whether the term "license," as used in proposed legislation to authorize and regulate the practice of emergency medical services providers, would be equivalent to the current term "certify."
Our opinion is as follows: The current regulatory regime for emergency medical services providers, although using the term "certify," is generally tantamount to a licensing regime. Accordingly, with one exception, the use of the term "license" in new legislation would not signify any substantive change. The one exception is that statutory "licensure" of Emergency Medical Technicians-Ambulance, Emergency Medical Technicians-Basic, and First Responders would contain a prohibition on unauthorized practice not found in current law.
 I Background
There are five categories of emergency medical services providers within the regulatory purview of the Maryland Institute of Emergency Medical Services Systems ("MIEMSS") and the Board of Physician Quality Assurance (the "Board"):
1. First Responders, who are regulated solely by MIEMSS;
2. Emergency Medical Technicians — Ambulance ("EMT-As"), who are regulated solely by MIEMSS;
3. Emergency Medical Technicians — Basic ("EMT-Bs"), who are also regulated solely by MIEMSS;[1]
4. Cardiac Rescue Technicians ("CRTs"), who are regulated by the Board in conjunction with MIEMSS; and
5. Emergency Medical Technicians — Paramedics ("EMT-Ps" or paramedics"), who are also regulated by the Board in conjunction with MIEMSS.
These various titles represent a progression in knowledge and skills: from First Responder, which is a program designed for law enforcement, fire department, and other public safety personnel, who, with limited equipment, may be called on to provide initial assessment and intervention; through EMT-P, which involves the delegated practice of medicine, including invasive procedures like endotracheal intubation and cardiac defibrillation.
The division of the authority to regulate emergency medical services providers parallels a traditional division of the providers into two groups, Basic Life Support and Advanced Life Support. MIEMSS alone has regulated Basic Life Support personnel.See § 13-1D-10(5) of the Education Article, Maryland Code (authorizing the Executive Director of MIEMSS to "[c]oordinate the training of all personnel in the Emergency Medical Services System and develop the necessary standards for their certification"). Because Advance Life Support involves activities that fall within the practice of medicine, the Board has regulated these providers.
The Board and MIEMSS are contemplating legislation that would transfer the authority to regulate EMT-Ps and CRTs to MIEMSS, thereby consolidating the regulation of emergency medical services providers in one State agency. Such departmental legislation was introduced as House Bill 1052 in the 1996 legislative session, but the bill was withdrawn prior to its hearing. Your question is whether the proposed legislation, which we shall assume to be substantively the same as House Bill 1052, would bring about a change in the status of these providers if the legislation were to authorize MIEMSS to "license" them, instead of "certifying" them, as under the current practice.
 II The Characteristics of a "Licensing" Regulatory Regime
"Historically, there has been no consistent usage of the terms licensure, certification or registration in the Maryland Code or in case law generally." Letter from Assistant Attorney General Kathryn M. Rowe to Senator Barbara A. Hoffman (March 7, 1989). Attempting to end this potential source of confusion, the Department of Legislative Reference has sought in recent years to establish consistent usage. For example, a model drafting guide from 1988 states that the term "license" is "the only term to be used to denote the privilege or right to practice that a State board issues." Department of Legislative Reference, Model Guidefor Drafting Governmental Units and Licensing Provisions 14 (Staff Draft 1988). Likewise, the General Revisor's Note to the Business Occupations Article, written in 1989, uses the term "license" to mean "an authorization to practice a particular occupation that a person who is not licensed in that occupation may not practice." Chapter 3 of the Laws of Maryland 1989 at 833.
An elaboration of this meaning of "licensure" was set out in an August 12, 1985 advice letter written by Assistant Attorney General Robert Zarnoch. Mr. Zarnoch observed that "a true licensing scheme will ordinarily regulate someone's right to practice a certain business or profession, define what constitutes such practice, establish an agency to monitor it and provide detailed and specific grounds for acquisition and loss of such a license."
A more recent advice letter summarized the key characteristics of a licensing scheme as follows:
 (1) delineation of the qualifications for entering the profession;
 (2) provision for review of the applicant's qualifications by a State agency;
 (3) prohibition against those without the specific credential practicing the profession;
 (4) identification of the scope of practice of the profession; [and]
 (5) establishment of disciplinary standards for those who practice the profession.
Advice letter from Assistant Attorney General Jack Schwartz to Senator Paula C. Hollinger (January 23, 1996).
By contrast, the term "certification" has come to be used to denote a lesser degree of regulation, lacking some of the key characteristics of licensing. "[T]he terms `certification' and `certified' are used to indicate an official recognition of a person as a qualified practitioner and an accompanying grant of the exclusive privilege or right to make certain representations." General Revisor's Note to the Business Regulation Article.
In a recent case, Reisch v. State, 107 Md. App. 464,668 A.2d 970 (1995), the Court of Special Appeals likewise drew a distinction between a certificate in lead abatement and a license issued to a professional, such as a plumber, electrician, or architect, who is required to meet certain standards of competence or experience as a prerequisite to engaging in that profession.107 Md. at 473-74. Pursuant to regulation, lead paint abatement workers are required to take a course approved by the Maryland Department of the Environment, consisting of at least six hours, once every five years. The instructor issues the certificate after the completion of the course. A list of students completing the course is provided to the Department of the Environment, which then makes the information available to the public. There are no provisions for disciplinary standards, decertification, or any review of applicants by the agency.
Nevertheless, despite this growing body of material seeking to denote substantive differences through use of the terms "license" and "certification," neither of these terms has intrinsic significance. As Ms. Rowe pointed out in her 1989 advice letter to Senator Hoffman, "the degree of regulation is determined by the provisions of the statute, not by the terminology chosen." For example, in that letter Ms. Rowe concluded that, although the Maryland Youth Camp Act used the term "certification," in substance it was a licensing statute. Similarly, the 1996 advice letter to Senator Hollinger determined that, although the regulatory regime for respiratory care practitioners is labeled "certification," it has all the essential elements of a "licensing" statute.
 III The Characteristics of the "Certification" Regulatory Regime for Emergency Medical Services Providers
In this part of the opinion, we shall assess whether the current regulatory regime for "certified" emergency medical services providers is substantively similar to a licensing regime. If so, then legislation to "license" these providers would not effect a substantive change.
A. EMT-Ps and CRTs
 1. Qualifications.
COMAR 10.32.08.03 delineates the qualifications for all applicants to EMT-P training programs; COMAR 10.32.08.05 delineates the qualifications for EMT-P certification. Similarly, COMAR 10.32.06.02 delineates the qualifications for applicants to CRT training programs; COMAR 10.32.06.05 delineates the qualifications for CRT certification.
2. Review of applications.
COMAR 10.32.08.05(C) provides that the Board is to act upon the EMT-P applicant's submission and approve that application if the certification requirements have been met. COMAR 10.32.06.05(C) provides the same for CRTs.
3. Unauthorized practice.
Under §§ 14-301 and 14-601 of the Health Occupations ("HO") Article, no one may practice medicine without a license issued by the Board, except as otherwise provided for in the Maryland Medical Practice Act. Essentially, HO §§ 14-303 and 14-305 provide exceptions for CRTs and EMT-Ps. They may perform limited activities, subject to the authority of the Board, that would otherwise be considered the practice of medicine and therefore could only be performed by a licensed physician.[2] In other words, a nonphysician who is not certified as required by HO §§ 14-303 and 14-305 and who does what a CRT or EMT-P does would be practicing medicine without a license.
4. Scope of practice.
The scope of practice for both CRTs and EMT-Ps is delimited in both the Medical Practice Act and implementing regulations. HO § 14-303 provides that, subject to the authority of the Board, a CRT may perform all phases of cardiopulmonary resuscitation, administer drugs or intravenous solutions as directed by a licensed physician, and obtain blood for laboratory analysis. HO § 14-305 provides that, subject to the authority of the Board, an EMT-P may perform all phases of cardiopulmonary resuscitation, all phases of prehospital life support, administer drugs and intravenous solutions as directed by a licensed physician, and obtain blood for laboratory analysis. Additionally, MIEMSS and the Board have issued extensive medical protocols that all CRTs and EMT-Ps are required to follow. Acting beyond this authorized scope of practice is a ground for discipline. COMAR 10.32.08.12 and 10.31.06.02.
5. Disciplinary standards.
HO § 14-303(c) provides for the discipline of CRTs. HO § 14-305(e) provides for the discipline of EMT-Ps. Additionally, the grounds for disciplinary action and the procedures to be followed are set out in substantial detail in the regulations for each program.
B. First Responders, EMT-As, and EMT-Bs
 1. Qualifications.
MIEMSS has specified detailed qualifications for certification in the EMT-A, EMT-B, and First Responder programs in testing and certification policies for each group of providers.
2. Review of applications.
The EMT-A, EMT-B, and First Responder testing and certification policies provide that applicants must submit verification of their successful completion of a MIEMSS-approved course prior to being tested for certification. MIEMSS administers the test and issues the certification upon a determination that the applicant has passed.
3. Unauthorized practice.
An EMT-A is defined at COMAR 10.32.08.01B(5) as "an individual who has been tested and certified by MIEMSS to provide basic life support." As we understand it, basic life support encompassing such actions as cardiopulmonary resuscitation, airway management, and control of bleeding — has not been considered by the Board to be the practice of medicine. Therefore, the lack of certification has no effect on anyone's prerogative to perform these actions.
4. Scope of practice.
The EMT-A, EMT-B, and First Responder skills are set out in course objectives, program standards, and protocols issued by MIEMSS. The MIEMSS testing and certification policies for each of those programs state that EMT-As, EMT-Bs, and First Responders may only practice the skills taught in a MIEMSS-approved course. The policies further provide that the performance of any medical act not specified by MIEMSS is grounds for decertification.
5. Disciplinary standards.
The testing and certification policies for EMT-As, EMT-Bs, and First Responders provide for the discipline of each of those levels of providers and set out specific grounds for decertification as well as the procedures to be followed.
C. Conclusion
In our view, the current "certification" regime for CRTs and EMT-Ps contains every essential characteristic of a "licensing" regime and serves the same function: to provide minimum standards for the training and approval of these providers and to protect the public from unqualified emergency medical services providers. The proposed legislation also contains the same essential characteristics of a licensing regime. If, as a result of legislation, these providers hold a "license," instead of a certificate, they will have no greater (or lesser) authority to function than they do today. The boundaries of their activities, as well as the degree of State authority, are determined by the provisions of the statute and implementing regulations and policies, not the terminology chosen. However, given current drafting practice, "licensure" is undoubtedly the better term to describe the current status of CRTs and EMT-Ps.[3]
The same is largely true of EMT-As, EMT-Bs, and First Responders, with one notable exception: Unlike the current situation, those without the requisite background and MIEMSS approval would be prohibited, under the proposed legislation, from providing services within the scope of practice of these providers.[4] Thus, under the proposed legislation, "licensure" is indeed the better term to describe the regulatory regime for EMT-As, EMT-Bs, and First Responders; but in this instance "licensure" signifies a broadening of the regulatory regime from that under current law — not the term itself, but the underlying substance.
 IV Conclusion
In summary, it is our opinion that the current statutory and regulatory regime for the authorization and regulation of emergency medical services providers, although using the term "certify," is in all substantive respects a licensing regime (except for the omission of an unauthorized practice provision relating to EMT-As, EMT-Bs, and First Responders). Accordingly, with that one exception, proposed legislation would effect no substantive change in the authority or regulation of emergency medical service providers if, in accordance with current drafting practice, the term "license" were used.
Very truly yours,
 J. Joseph Curran, Jr. Attorney General
 Jack Schwartz Chief Counsel Opinions and Advice
[1] EMT-As and EMT-Bs are essentially the same level. EMT-B is the national standard, established by the National Highway Safety Administration, for the basic level of emergency medical services. However, EMT-B does have a somewhat more expansive scope of practice. An EMT-B may assist in administering medication and operate an Automatic External Defibrillator, a shocking device used in the event of a cardiac incident. EMT-B has been adopted by Maryland with some modifications and is currently in the pilot phase. It will eventually replace the EMT-A category.
[2] The term "practice medicine" includes "treating . . . any physical . . . ailment . . . [b]y appliance, . . . drug, . . . or treatment." HO § 14-101(k)(2).
[3] We note that, as a matter of practice, the Board has historically reserved the term "license" for the physicians that it regulates. Other health professionals regulated by the Board, such as acupuncturists, have been "certified" or "registered." In 1994 a separate Acupuncture Board was created to "license" acupuncturists who were previously "registered" by the Board. HO Title 1A, the Maryland Acupuncture Act. There was no substantive change between the registration regime and the licensing regime.
[4] Under House Bill 1052, with some exceptions, unlicensed individuals would have been prohibited from providing "out-of-hospital emergency services."
 *Page 121